# IN THE SUPREME COURT OF IOWA

No. 15–0862

Filed June 9, 2017

Amended August 11, 2017

**ROBERTO MORALES DIAZ,**

    Appellee,

vs.

**STATE OF IOWA,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Tama County, Mary E. Chicchelly, Judge.

Roberto Morales Diaz seeks further review of a court of appeals decision reversing the district court's grant of postconviction relief. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED AND CASE REMANDED.**

Thomas J. Miller, Attorney General, Kevin Cmelik and Sharon K. Hall, Assistant Attorneys General, for appellant.

Dan Vondra of Cole & Vondra, P.C., Iowa City, for appellee.

**CADY, Chief Justice.**

In this case, we consider the scope of an attorney's responsibility to advise a client who is an unauthorized alien in the United States of the immigration consequences of pleading guilty to a criminal offense. The district court held the attorney's advice was insufficient and ordered the defendant, Roberto Morales Diaz, be allowed to withdraw his plea. On appeal, we transferred the case to the court of appeals. The court of appeals reversed, finding counsel had no duty to provide specific advice on the immigration consequences of pleading guilty. The court of appeals also held Morales Diaz failed to show any deficiency of counsel caused him prejudice. On further review, we vacate the court of appeals and affirm the district court. We conclude Morales Diaz's attorney failed in his duty to advise his client of the direct and severe immigration consequences of pleading guilty to the crime of aggravated misdemeanor forgery, leading Morales Diaz to plead guilty and subject himself to automatic and permanent removal. We remand this case for further proceedings.

## I. Factual Background and Proceedings.

Roberto Morales Diaz began residing in the United States in 2002. He entered this country without examination by the Department of Homeland Security. Morales Diaz has a young daughter who is a U.S. citizen. He was her primary caregiver until he was taken into custody and removed to Mexico. Until this case, Morales Diaz had no criminal record.

On January 24, 2013, a City of Toledo police officer responded to a report of a domestic disturbance. The mother of Morales Diaz's daughter reported she felt threatened by Morales Diaz during an argument. The altercation did not include physical violence. The officer placed

Morales Diaz in a squad car and asked for identification. Morales Diaz produced a Texas identification card bearing his name. The officer then learned the identification number on the card was registered to a different name. The officer also observed the card had no security features. The officer decided to transport Morales Diaz to the Toledo police station for further questioning.

At the station, the officer interrogated Morales Diaz with the aid of an interpreter. The officer told Morales Diaz he was not going to be arrested for the reported domestic disturbance, but he was going to be questioned about the identification card. Morales Diaz explained he obtained the card from an office building in Houston he thought was the Texas Department of Public Safety. He stated he paid $100 for the card and was advised he could use it to operate a motor vehicle and open bank accounts. The officer asked Morales Diaz if he was in the United States legally. Morales Diaz initially responded he legally immigrated to the United States, but later admitted he was residing here without authorization. After this admission, the officer placed Morales Diaz under arrest. Morales Diaz continued to deny knowledge of any illegality with the identification card. The officer transported Morales Diaz to the county jail and contacted Immigration and Customs Enforcement (ICE). ICE began removal proceedings. The county attorney filed a trial information charging Morales Diaz with forgery as a class "D" felony under Iowa Code section 715A.2(1)(*d*) and (2)(*a*) (2013).

Morales Diaz was released on bail. He retained counsel. The court continued the state forgery proceedings against him several times to give him time to resolve his federal immigration status. On July 8, 2014, however, he failed to appear at an immigration hearing in Omaha, Nebraska. He also failed to appear at a scheduled plea hearing in Iowa

state court. After a Tama County court issued an arrest warrant, he turned himself in and was held in the county jail.

Morales Diaz's counsel visited him in jail. According to Morales Diaz, his counsel gave him a written guilty plea to sign, but did not advise him of any of the immigration consequences of pleading guilty. According to his counsel, counsel advised Morales Diaz that because he missed his immigration hearing he was "probably going to be deported no matter what happened." Counsel stated Morales Diaz responded that he "just wanted to get this over with," before he signed the written plea of guilty to aggravated misdemeanor forgery under Iowa Code section 715A.2(2)(*b*). Consistent with the plea agreement, the court imposed a two-year suspended sentence. Nevertheless, based on this conviction, federal authorities subsequently removed him from the United States to Mexico.

Morales Diaz returned to the United States in Department of Homeland Security custody and filed for postconviction relief in district court. He asserted he was denied his right to the effective assistance of counsel under the Sixth Amendment to the U.S. Constitution. He argued his counsel should have advised him that forgery under Iowa Code section 715A.2(2)(*b*) constituted an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(R) (2012). In turn, he argued his counsel should have advised him that pleading guilty to an aggravated felony has severe, automatic, and irreversible immigration consequences, including foreclosure of "cancellation of removal," a proceeding by which the Attorney General may adjust the status of a removable alien to that of a lawful permanent resident. *See* 8 U.S.C. § 1229b(b)(1)(C). Additionally, he argued his counsel should have advised him that his physical presence in the United States for more than ten years and his good moral

character would have allowed him to seek this relief if he could establish his removal would result in "exceptional and extremely unusual hardship" to his daughter. *Id.* § 1229b(b)(1)(A)–(D). Because his counsel failed to advise him of these immigration consequences of his plea, Morales Diaz argued he should be allowed to withdraw his plea and defend the charges at trial.

The district court agreed and vacated his conviction. The court found Morales Diaz's counsel had a duty to advise him of the clear and foreseeable immigration consequences of pleading guilty, not just that there was a possibility he could be removed. It found Morales Diaz's counsel failed to perform this duty and Morales Diaz could prove prejudice because, based on his counsel's failure, he gave up his right to a trial, which he would not have done had he known that pleading guilty to forgery would permanently separate him from his daughter.

The State appealed, and the court of appeals reversed. The court of appeals found counsel for Morales Diaz had no duty to advise him of the specific immigration consequences of his plea, and in the alternative, that he could not show he was prejudiced by counsel's failure. We granted further review.

## II. Standard of Review.

Although "[w]e typically review postconviction relief proceedings on error," we review ineffective-assistance-of-counsel claims de novo. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001); *see also State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016). "Ineffective-assistance-of-counsel claims require a showing by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." *Schlitter*, 881 N.W.2d at 388.

### III. Analysis.

The right to counsel guaranteed by the Sixth Amendment to the U.S. Constitution is a "right to the effective assistance of counsel."[1] *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14 (1970)). This right is not limited to trial. Instead, the Sixth Amendment right to counsel "at least" extends to all critical stages of the prosecution after the initiation of formal proceedings. *See Rothgery v. Gillespie County*, 554 U.S. 191, 212, 128 S. Ct. 2578, 2591 (2008). Thus, the right to counsel plainly extends to that critical stage of the prosecution in which a defendant considers pleading guilty to the charges. *See McMann*, 397 U.S. at 770–71, 90 S. Ct. at 1448–49. Counsel's duty at this stage is no less important than it is at trial. *See Missouri v. Frye*, 566 U.S. 133, 143–44, 132 S. Ct. 1399, 1407 (2012). It is a duty to provide competent and thorough advice, to represent the client's interests with vigor and diligence, and to fulfill those "anxious responsibilities" with which we have entrusted the bar. *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 247, 77 S. Ct. 752, 760 (1957) (Frankfurter, J., concurring). It is a duty that is embodied in the very name the profession has appropriated: to counsel. Moreover, it is a duty that exists separate from the colloquy engaged in by the district court

---

[1]Article I, section 10 of the Iowa Constitution also guarantees a right to the effective assistance of counsel. *See* Iowa Const. art. I, § 10; *Schlitter*, 881 N.W.2d at 388. However, Morales Diaz specifically raised only the U.S. Constitution in his application for postconviction relief and in his arguments on appeal. Therefore, we will confine our analysis to the U.S. Constitution. *See State v. Prusha*, 874 N.W.2d 627, 629–30 (Iowa 2016); *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 518 n.2 (Iowa 2011). Doing so, we reserve the right to interpret the Iowa Constitution more stringently than its federal counterpart in future cases. *See State v. Short*, 851 N.W.2d 474, 491–92 (Iowa 2014).

under Iowa Rule of Criminal Procedure 2.8. *See State v. Rhodes*, 243 N.W.2d 544, 545 (Iowa 1976) ("The court's inquiry is intended to supplement but not supplant advice of counsel.").

An attorney fails to fulfill this duty when the attorney fails to advise a client of the immigration consequences of a plea. *See Padilla v. Kentucky*, 559 U.S. 356, 367–68, 130 S. Ct. 1473, 1482 (2010). Immigrant clients rely on criminal defense counsel to advise them of immigration consequences because these consequences are of great, even overwhelming, importance to them. *See id.* at 368, 130 S. Ct. at 1483. Changes in immigration law have increased enforcement and reduced discretion in the event of a criminal conviction. *See id.* at 363–64, 130 S. Ct. at 1480. These changes have shifted the responsibility to protect immigrants from potential inequities in the immigration system to criminal defense counsel. *See* Christopher N. Lasch, *"Crimmigration" and the Right to Counsel at the Border Between Civil and Criminal Proceedings*, 99 Iowa L. Rev. 2131, 2149–50 (2014); *see also* Andrés Dae Keun Kwon, Comment, *Defending Criminal(ized) "Aliens" after* Padilla*: Toward a More Holistic Public Immigration Defense in the Era of Crimmigration*, 63 UCLA L. Rev. 1034, 1057 (2016). In response, many new resources have emerged to assist the defense bar in this growing responsibility, including quick-access charts, frequently asked questions and answers, opportunities for legal training, and free consultations with immigration experts. *See* Immigrant Def. Project, Resources: Criminal Defense Attorneys, https://www.immigrantdefenseproject.org/defender-resources/ (last visited June 2, 2017); Immigrant Legal Res. Ctr., Books and Trainings, https://www.ilrc.org/store (last visited June 2, 2017); Nat'l Ass'n of Criminal Def. Lawyers, Immigration Practice Advisories and Additional Res., https://www.nacdl.org/ResourceCenter.aspx?id=21195

(last visited June 2, 2017); Univ. of Iowa, Advanced Immigration Law and Policy Project, https://ailp.law.uiowa.edu/crimmigration-project (last visited June 2, 2017). As states and localities struggle to define their role, desired or not, as partners in immigration enforcement, *see* Ingrid V. Eagly, *Immigrant Protective Policies in Criminal Justice*, 95 Tex. L. Rev. 245, 247 (2016), defense counsel must embrace his or her new role as a "crimmigration" attorney, Juliet Stumpf, *The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power*, 56 Am. U. L. Rev. 367, 381 (2006), if counsel is to provide effective assistance.

To establish counsel provided constitutionally deficient representation, the defendant must establish counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064; *see also State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012). We look to "the practice and expectations of the legal community" in defining this standard. *Padilla*, 559 U.S. at 366, 130 S. Ct. at 1482; *see also Dempsey v. State*, 860 N.W.2d 860, 868 (Iowa 2015). If the defendant makes the requisite showing under this first prong, the defendant must then show that, but for counsel's ineffective assistance, he or she "would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); *see also State v. Straw*, 709 N.W.2d 128, 138 (Iowa 2006). This does not mean the defendant must show he or she would have prevailed at trial. Rather, the defendant must only show the "decision to reject the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372, 130 S. Ct. at 1485.

**A. Constitutional Deficiency.** Morales Diaz argues his counsel should have advised him of the immigration consequences of the plea. If we accept counsel's testimony, counsel advised Morales Diaz that

whether he pled or went to trial, he would "probably" be deported. We must decide whether the Constitution required more. In doing so, we examine, in light of *Padilla*'s holding, the State's argument that Morales Diaz's counsel was not required to advise him any more than that deportation was possible and Morales Diaz's argument that trial counsel's advice was deficient because he was not told a guilty plea meant deportation was virtually certain under the immigration statute.

In *Padilla*, the Court addressed these arguments once it corrected the course we and many other courts had followed to categorically exclude immigration consequences from counsel's duty to advise noncitizen defendants of the legal consequences of a guilty plea. *See Padilla*, 559 U.S. at 366, 130 S. Ct. at 1482; *see also Perez v. State*, 816 N.W.2d 354, 360 (Iowa 2012). Once the *Padilla* Court held the right to effective counsel included a duty to advise a defendant of the risk of deportation, it turned to the facts of the case to determine if the advice given fell below the standard of reasonableness. 559 U.S. at 366, 130 S. Ct. at 1482. Under those facts, the client, José Padilla, was advised by counsel that his conviction would not result in his removal from the country. *Id.* at 368, 130 S. Ct. at 1483. The Court found this advice was deficient because the immigration statute provided for deportation based on certain criminal convictions, and a conviction for the crime Padilla pled guilty to was clearly and explicitly included under the statute. *Id.* at 368–69, 130 S. Ct. at 1483. Additionally, the statute essentially offered no relief from deportation based on such a conviction. *See id.* Thus, under the law, any noncitizen's removal would be "practically inevitable" after pleading guilty to a removable offense. *Id.* at 363–64, 130 S. Ct. at 1480. This consequence supported the imposition of the duty on counsel to provide proper advice. *Id.*

Accordingly, defense counsel under *Padilla* has a responsibility to advise noncitizen defendants whether a conviction for the crime that is the subject of the guilty plea agreement is also a crime that renders a noncitizen deportable. In addressing the nature of the advice, the Court indicated if the crime clearly falls under the statute, counsel must provide equally clear advice that deportation is a consequence of pleading guilty. *See id.* at 369, 130 S. Ct. at 1483. If the crime is not clearly within the immigration statute, counsel must advise that a plea of guilty may result in adverse immigration consequences. *See id.*

It must be observed that deportation is a broad concept, and the adverse immigration consequences of a criminal conviction to a noncitizen under the immigration statute are not limited to removal from this country. In addition to removal from the country, the immigration statute also carries consequences associated with removal, such as exclusion, denial of citizenship, immigration detention, and bar to relief from removal. *See generally* 8 U.S.C. § 1182 ("Inadmissible aliens"); *id.* § 1226 ("Apprehension and detention of aliens"); *id.* § 1227 ("Deportable aliens"); *id.* § 1229b ("Cancellation of removal; adjustment of status"). Thus, in addition to deciding if the conviction is a deportable conviction under the statute, a question also exists whether or not counsel must describe the associate statutory consequences. In other words, the question is whether counsel must not only consider if the conviction is a deportable conviction under the statute, but must also explain the meaning of deportation by identifying the specific statutory consequences.

We find the "clear" and "unclear" dichotomy in *Padilla* relates only to whether the crime charged is a crime covered under the immigration statute. In turn, the distinction relates to the likelihood that immigration

consequences will follow a conviction of the crime. If the crime faced by a defendant is clearly covered under the immigration statute, counsel must advise the defendant that the immigration consequences will almost certainly follow. If the crime is not clearly covered under the statute, counsel must advise the defendant that immigration consequences may follow. Yet, the more vexing question is the extent to which counsel must advise of the specific consequences beyond deportation. We must answer this question to complete the analysis in *Padilla* and address the State's argument that Morales Diaz's counsel was not required to advise him on anything other than the risk of deportation, as well as Morales Diaz's argument that he was entitled to complete advice on the foreseeable immigration consequences of his plea.[2]

We recognize *Padilla* has been read to impose a duty on counsel only to warn of the risk of deportation, not of other consequences such as foreclosure of cancellation of removal or a permanent bar on reentry. *See, e.g., Rosario v. State*, 165 So. 3d 672, 673 (Fla. Dist. Ct. App. 2015) (per curiam) (finding *Padilla* does not require advice on "[t]he possibility for an adjustment in status"); *Garcia v. State*, 425 S.W.3d 248, 260 (Tenn. 2013) (finding *Padilla* does not require advice on "future eligibility to immigrate legally to the United States" but noting trial counsel's extensive research and advice would satisfy any such duty). Yet, we do

---

[2]In his application for postconviction relief, Morales Diaz alleged his conviction rendered him ineligible for cancellation of removal and further alleged his attorney failed to advise him of the clear immigration consequences of his plea. On appeal, he argued his attorney breached his duty by failing to inform him of the "severity of the consequences and the ability to avoid those consequences." The State argued on appeal that the district court erred in finding counsel for Morales Diaz was "ineffective under *Padilla* in failing to give correct or complete immigration advice."

not believe the Court intended to create a new standard for determining effective assistance of counsel or to limit the advice of counsel to exclude a full explanation of the various immigration consequences of pleading guilty. Instead, counsel after *Padilla* is held to the same standard counsel was before *Padilla*: to provide objectively reasonable assistance as measured by prevailing professional norms. *See Commonwealth v. Lavrinenko*, 38 N.E.3d 278, 290 (Mass. 2015) ("[T]he failure of a criminal defense attorney to make a reasonable inquiry of the client regarding his or her citizenship and immigration status is sufficient to satisfy the deficient performance prong of the ineffective assistance analysis."); *State v. Favela*, 343 P.3d 178, 182 (N.M. 2015) ("A defense attorney's failure to advise a client of the 'specific immigration consequences of pleading guilty, including whether deportation would be virtually certain' renders that attorney's performance deficient, which satisfies the first prong of the *Strickland* test." (quoting *State v. Paredez*, 101 P.3d 799, 805 (N.M. 2004))); *see also* Lindsay C. Nash, *Considering the Scope of Advisal Duties Under* Padilla, 33 Cardozo L. Rev. 549, 576 (2011) ("[D]efense attorneys must investigate and research the law using available resources and then advise noncitizen defendants about immigration consequences at the level of specificity that research permits."). Counsel's duty as interpreted in *Padilla* does not depend on an assessment of the clarity of the consequences or on categorizing them as strictly related to deportation. Instead, consistent with the approach we have always taken, counsel's duty depends on society's expectations of its attorneys.

In *Padilla*, the U.S. Supreme Court looked to "norms of practice as reflected in American Bar Association standards and the like" to measure counsel's performance. *Padilla*, 559 U.S. at 366, 130 S. Ct. at 1482 (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065). Consulting the

current version of the American Bar Association guidelines now, we find they recommend the following:

> (a) Defense counsel should determine a client's citizenship and immigration status, assuring the client that such information is important for effective legal representation and that it should be protected by the attorney-client privilege. Counsel should avoid any actions that might alert the government to information that could adversely affect the client.
>
> (b) If defense counsel determines that a client may not be a United States citizen, counsel should investigate and identify particular immigration consequences that might follow possible criminal dispositions. Consultation or association with an immigration law expert or knowledgeable advocate is advisable in these circumstances. Public and appointed defenders should develop, or seek funding for, such immigration expertise within their offices.
>
> (c) After determining the client's immigration status and potential adverse consequences from the criminal proceedings, including removal, exclusion, bars to relief from removal, immigration detention, denial of citizenship, and adverse consequences to the client's immediate family, counsel should advise the client of all such potential consequences and determine with the client the best course of action for the client's interests and how to pursue it.
>
> (d) If a client is convicted of a removable offense, defense counsel should advise the client of the serious consequences if the client illegally returns to the United States.

ABA Standards for Criminal Justice: Prosecution Function and Def. Function 4-5.5 (4th ed. 2015) [hereinafter ABA Standards]. We recognize these recommendations are demanding, but we do not find them too onerous a burden to place on the professional advisers employed to represent their clients' best interests.

Additionally, we observe a proliferation of reference guides since the *Padilla* decision. *See, e.g.,* Am. Immigration Council, *Aggravated Felonies: An Overview* (2016) [hereinafter AIC, *Aggravated Felonies*]; Immigrant Def. Project, *Sample Aggravated Felony Case Law Determinations* (2012) [hereinafter IDP, *Aggravated Felony*

*Determinations*]; Univ. of Iowa Coll. of Law Advanced Immigration Law & Policy, *Immigration Consequences for Iowa Criminal Statutes* (2015) [hereinafter AILP, *Iowa Immigration Consequences*]. Regarding Morales Diaz's case, even a brief review of these guides reveals the crime of aggravated misdemeanor forgery is an aggravated felony for purposes of immigration law if it results in a sentence of a year or more. *See* AILP, *Iowa Immigration Consequences* 220–21 (identifying conviction under Iowa Code section 715A.2(2)(*b*) as an aggravated felony); IDP, *Aggravated Felony Determinations* C-57 to C-58 (compiling cases in which convictions of forgery were determined to be aggravated felonies). They also reveal that a conviction of an aggravated felony has immediate and far-reaching immigration consequences. *See* AILP, *Iowa Immigration Consequences* 220; AIC, *Aggravated Felonies* 2–4.

Aided by these guides and turning to the clear language of the immigration statute, we find these consequences include, to begin with, rendering any alien immediately removable. *See* 8 U.S.C. § 1227(a)(2)(A)(iii). They also include subjecting the alien to mandatory detention during expedited removal proceedings. *See id.* §§ 1226(c)(1)(b), 1228(a)(2). They include foreclosure of a cancellation of removal proceeding, *see id.* § 1229b(b)(1)(C), and they include a permanent bar on legal reentry with narrow exception, *see id.* § 1182(a)(9)(ii)(I). Finally, they include a fine and twenty years of incarceration if the alien tries to reenter the country and is apprehended. *See id.* § 1326(b)(2).

Our review of these professional norms shows us that counsel has an obligation to inform his or her client of all the adverse immigration consequences that competent counsel would uncover. We do not believe clients expect their counsel to only advise them that the chances of deportation are certain or possible. *See Padilla*, 559 U.S. at 368, 130

S. Ct. at 1483. Instead, clients expect their counsel to conform to the "practice and expectations of the legal community," *id.* at 366, 130 S. Ct. at 1482, which in this case is an expectation enhanced by vast professional support. Whether or not deportation consequences are certain or possible under a criminal charge, the specific statutory consequences need to be explained with reasonable clarity so a full and measured decision to plead guilty can be made. This approach is integrated into the ABA guidelines, which instruct counsel to determine and advise of the "potential adverse consequences from the criminal proceedings, including removal, exclusion, bars to relief from removal, immigration detention, denial of citizenship, and adverse consequences to the client's immediate family." ABA Standards 4-5.5(c). Certainly, any person contemplating a plea of guilty to a crime that could lead to deportation would want to know the full meaning and consequences of deportation.

In this case, counsel for Morales Diaz did not inform him of the direct, severe, and certain immigration consequences of pleading guilty to forgery. Instead, counsel relied on an erroneous belief that missing an immigration hearing foreclosed all relief. *See* 8 U.S.C. § 1229a(b)(5)(C)(i). Even if removal was highly likely following Morales Diaz's failure to appear, *see id.* § 1229a(b)(5)(A), counsel never mentioned the crime constituted an aggravated felony, *see* 8 U.S.C. § 1101(a)(43)(R); Iowa Code § 715A.2(2)(*b*); *id.* § 903.1(2), and never attempted to explain the sweeping ramifications of that classification. The practice and expectations of the legal community, and its clients, reveals counsel has a duty to provide that information. Therefore, counsel for Morales Diaz provided constitutionally deficient representation by not doing so.

**B. Prejudice.** Having established counsel provided constitutionally deficient performance, Morales Diaz must still show this deficiency resulted in prejudice to succeed on his claim of ineffective assistance of counsel. Morales Diaz testified that had his counsel informed him of the immigration consequences of his plea, he never would have entered it. We must decide whether this would have been a rational choice. *See Padilla*, 559 U.S. at 372, 130 S. Ct. at 1485.

The State asserts Morales Diaz is unable to show prejudice for two basic reasons. First, the State notes he was an unauthorized alien and was subject to deportation before he pled guilty, just as he was after he pled guilty. The State argues any relief from deportation under federal law based on his length of stay and family ties in the United States was too speculative. Second, the State argues the evidence against Morales Diaz overwhelmingly supported a conviction to the charged offense, and the plea to the lesser offense was rational even if he had been informed of the immigration consequences because it afforded him an opportunity to obtain temporary release and make arrangements for his daughter before deportation proceedings commenced.

Generally, a decision to reject a plea bargain may be rational for many reasons. The defendant could have a legal or factual defense to the crime charged. *See Hill*, 474 U.S. at 59, 106 S. Ct. at 370–71; *Kovacs v. United States*, 744 F.3d 44, 53 (2d Cir. 2014). The defendant could be hoping to obtain a better plea bargain, *see Padilla v. Commonwealth*, 381 S.W.3d 322, 330 (Ky. Ct. App. 2012), or leniency at sentencing, *see Commonwealth v. Gordon,* 974 N.E.2d 645, 654 (Mass. App. Ct. 2012). The defendant could lack all of these things, but nevertheless rationally decide to "roll the dice" if presented with a plea deal certain to be almost as damaging as a loss at trial. *See DeBartolo v. United States*, 790 F.3d

775, 780 (7th Cir. 2015); *see also Hernandez v. United States*, 778 F.3d 1230, 1234 (11th Cir. 2015); *United States v. Orocio*, 645 F.3d 630, 645 (3d Cir. 2011), *abrogated on other grounds by Chaidez v. United States*, 568 U.S. 342, 133 S. Ct. 1103 (2013).

The State essentially claims unauthorized aliens cannot be prejudiced under a Sixth Amendment challenge because they are already subject to removal. We reject this claim for several reasons. There is a vast difference for an unauthorized alien between being generally subject to removal and being convicted of a crime that subjects an unauthorized alien to automatic, mandatory, and irreversible removal. Additionally, removal is not a foregone conclusion for every unauthorized alien. Immigration policy is subject to change, as is enforcement. Furthermore, unauthorized aliens may seek lawful permanent resident status under the law if they meet certain qualifications. 8 U.S.C. § 1229b(b)(1)(A)–(D). A plea of guilty to certain offenses can foreclose this process. *See id.* § 1229b(b)(1)(C). Finally, an unauthorized alien may rationally choose to reject a plea deal for the same reasons a U.S. citizen might. *See* Daniel A. Horwitz, *Actually,* Padilla *Does Apply to Undocumented Defendants*, 19 Harv. Latino L. Rev. 1, 15–16 (2016).

We find it unnecessary to decide if " 'overwhelming evidence' of guilt" forecloses a showing of prejudice. *See Lee v. United States*, 825 F.3d 311, 314 (6th Cir.), *cert. granted*, 85 U.S.L.W. 3284 (U.S. Dec. 14, 2016) (No. 16–327). The State charged Morales Diaz with forgery under Iowa Code section 715A.2(2)(*a*)(4), for possession of a document required for or as evidence of authorized stay in the United States. Morales Diaz asserts various evidentiary issues and challenges the State's ability to meet its burden of proof. Additionally, we note the crime of forgery requires a specific intent to defraud or injure another or have knowledge

of the facilitation of a fraud or injury, Iowa Code § 715A.2(1), and Morales Diaz maintained he believed the identification card he obtained in Texas was legitimate. We find the evidence of guilt is not overwhelming.

We conclude the record supports the finding of prejudice. Morales Diaz has a daughter in this country. By pleading guilty, he all but guaranteed he would never be physically present in her life to help her grow. If he had not pled guilty, he could have defended himself at trial. He could have asserted various evidentiary issues and challenged the State's ability to prove all elements of the charge. *See* Iowa Code § 715A.2(1)(*d*). He could have hoped for a better plea bargain by holding out for a plea of guilty to simple misdemeanor possession of a fraudulently altered identification card. *See id.* § 321.216(1). Finally, he could have otherwise rationally decided to hold the State to its burden of proof. *See DeBartolo*, 790 F.3d at 779–80. Cancellation of removal under 8 U.S.C. § 1229b was available to him—until he pled guilty. Like the district court, we are not convinced Morales Diaz would have "just wanted to get this over with" had counsel provided effective assistance by advising him of the immigration consequences a plea entailed.

## IV. Conclusion.

According to the State, Roberto Morales Diaz was found in possession of a fake identification card. Based on this information, the State charged him with a crime carrying a mandatory term of five years' incarceration. On advice from counsel, he pled guilty to a crime with a suspended sentence. In doing so, he gave up the chance to stay in the country where he has resided peacefully for the past decade. Instead, he was promptly and permanently removed to Mexico. We conclude Morales Diaz would not have accepted this plea agreement if he had been

provided the effective assistance of counsel to which he was entitled under the Sixth Amendment to the U.S. Constitution. Therefore, we must vacate the court of appeals, affirm the district court, and remand this case to allow him to withdraw his plea and stand for trial.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED AND CASE REMANDED.**

All justices concur except Mansfield, Waterman, and Zager, JJ., who concur specially.

**MANSFIELD, Justice (concurring specially).**

I concur in the result and in most of the court's opinion. I agree that the defendant's trial counsel provided ineffective assistance by failing to advise his client that he would be deported based on his guilty plea. This was a "truly clear" consequence, and counsel had a duty to tell his client about it. *See Padilla v. Kentucky*, 559 U.S. 356, 369, 130 S. Ct. 1473, 1483 (2010). Additionally, Roberto Morales Diaz suffered prejudice because, as the district court found, he would not have pled guilty had he been properly advised on this point. Therefore, I agree the district court's judgment should be affirmed.

However, the court today goes a step further. It imposes a duty on counsel to explain to the client "the full meaning and *consequences* of deportation." (Emphasis added.) The parties have not briefed or argued this issue. Both here and in the district court, the alleged breach of duty involved trial counsel's incorrect advice that Morales Diaz *might* be deported if he pled guilty, when in fact it was certain Morales Diaz *would* be deported. The majority confuses this straightforward argument on breach of duty with the more elaborate argument Morales Diaz made to establish prejudice—i.e., to show that he would have gone to trial if he had been told the guilty plea would result in automatic deportation. Thus, contrary to what the court says, eligibility for "cancellation of removal" was raised not as something that criminal defense counsel has a duty to explain to the client, but as an explanation for why a rational criminal defendant would have taken his chances at trial. Hence, this case does not present the alleged duty of counsel to "advise of the specific consequences beyond deportation." We do not need to decide

whether such a duty exists to resolve the present case. I would not decide the issue today *sua sponte*.

"Immigration law can be complex, and it is a legal specialty of its own." *Padilla*, 559 U.S. at 369, 130 S. Ct. at 1483. As I read *Padilla*, it focuses on whether or not the client will be deported as a result of the plea, not on the panoply of effects that may or may not flow *from* deportation. The Court repeatedly stressed the "unique nature of deportation," *id.* at 365, 130 S. Ct. at 1481, noting it had "long recognized that deportation is a particularly severe 'penalty,'" *id.* (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 740, 13 S. Ct. 1016, 1032 (1893) (Brewer, J., dissenting)); *see id.* at 368, 130 S. Ct. at 1483 ("[P]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." (quoting *INS v. St. Cyr*, 533 U.S. 289, 322, 121 S. Ct. 2271, 2291 (2001)); *see also Chaidez v. United States*, 568 U.S. 342, ___, 133 S. Ct. 1103, 1112 (2013) (noting that in *Padilla*, "we relied on the special 'nature of deportation,'" including "the severity of the penalty" (quoting *Padilla*, 559 U.S. at 365, 130 S. Ct. at 1481)). Hence, the crux of the decision turned on deportation itself, not on potential ramifications stemming from deportation.

Several appellate courts have declined to expand *Padilla*'s scope beyond advice on deportation. The Tennessee Supreme Court confronted this exact issue in *Garcia v. State*, 425 S.W.3d 248 (Tenn. 2013). In that case, the petitioner had earlier pled guilty to several criminal charges. *Id.* at 253. Following his conviction, the petitioner filed for postconviction relief, arguing that trial counsel was ineffective by failing to explain whether his guilty plea would either "result in his deportation" or "bar his future legal admission into the United States." *Id.* at 257. In

other words, the petitioner argued that under *Padilla*, trial counsel "should have done more than advise that the plea could have future immigration consequences." *Id.* The state responded that trial counsel clearly informed the petitioner that he would be deported, but disputed that counsel's duty extended to questions of future admissibility into the country, as that issue was "merely a collateral (and speculative) consequence of a guilty plea." *Id.* at 257–58.

Relying on *Padilla*, the court rejected the petitioner's claims. The court first noted there was clear evidence that the petitioner knew he would be subject to deportation upon pleading guilty. *Id.* at 259. But further, the court agreed with the state regarding counsel's duty to advise on *future* immigration consequences:

> With respect to the consequences of a guilty plea for future attempts to legally immigrate to the United States, as the State points out, *Padilla* involved only defense counsel's obligation to advise of the deportation consequences of a guilty plea. *Padilla* does not address counsel's obligation to advise a client regarding the effect a guilty plea will have upon the client's future eligibility to immigrate legally to the United States. Extending *Padilla* as the petitioner suggests would impose a substantial burden upon defense counsel. Legal immigration depends upon many factors, which may change as a result of Congressional action, executive agency policy choices, or court decisions. *Padilla* neither mandates, nor even suggests, that defense counsel in a state criminal trial must be able to advise her client of the effect a guilty plea is likely to have upon the client's future eligibility to immigrate legally to the United States.

*Id.* at 260.

The Florida District Court of Appeal has rejected a similar claim that *Padilla* mandates advice regarding whether a guilty plea may have "a negative impact on the possibility of avoiding removal or being able to reenter." *Rosario v. State*, 165 So. 3d 672, 673 (Fla. Dist. Ct. App. 2015) (per curiam). The court reasoned,

> Beyond advising of the risk of deportation as required by *Padilla,* counsel had no affirmative duty to provide advice about other possible immigration ramifications of the plea, such as whether the plea might negatively impact her ability to obtain an adjustment in status, a waiver of inadmissibility, or cancellation of removal. *Padilla* did not create a duty for criminal defense counsel to provide all manner of advice about possible immigration consequences flowing from a plea.

*Id.* at 673.  The court also added that "[t]he possibility for an adjustment in status, a matter within the exclusive discretion of federal officials, is too speculative."  *Id.*; *see also Yanez v. State,* 170 So. 3d 9, 11–12 (Fla. Dist. Ct. App. 2015) (holding that *Padilla* does not expand counsel's duty to advise on potential status adjustment).

The Tennessee and Florida courts are not alone.  Other courts have adhered to the same distinction between advice on deportation *per se* and broader immigration advice.  *See United States v. Chan,* 792 F.3d 1151, 1154 (9th Cir. 2015) (noting that *Padilla* was narrow in that it "concerned only deportation," not "all 'immigration consequences'" (quoting *United States v. Kwan,* 407 F.3d 1005, 1015 (9th Cir. 2005)); *see also United States v. Suero,* No. 09–cr–41–JL, 2014 WL 6896011, at *4 & n.2 (D.N.H. Dec. 5, 2014) (declining to extend *Padilla* to advising a client on "any effect on his right to foreign travel"); *United States v. Chezan,* No. 10 CR 905–1, 2014 WL 8382792, at *24–25 (N.D. Ill. Oct. 14, 2014) (concluding that *Padilla* does not extend to the context of mandatory detention); *United States v. Dolmuz-Carcamo,* Cr. No. C–11–169, Ca. No. C–12–333, 2013 WL 3324207, at *3 n.3 (S.D. Tex. July 1, 2013) (noting that "*Padilla* does not require . . . more involved questions of immigration law to be handled by criminal defense lawyers," such as permanent-residency status and political asylum); *Garcia v. United States,* No. CR 97–022 MEJ, 2012 WL 5389908, at *5 (N.D. Cal. Nov. 5, 2012) (noting that *Padilla* applies "*only* when those [specific]

consequences are deportation or removal, as opposed to *any* immigration consequences"); *United States v. Randazzo*, No. 11–2411, No. 06–288, 2011 WL 1743395, at *6 n.7 (E.D. Pa. May 6, 2011) ("[W]e reject Randazzo's suggestion that *Padilla* should be read more broadly to create a general right to complete and accurate counseling at sentencing regarding the precise immigration consequences of a conviction and sentence."); *cf. People v. Arendtsz*, 202 Cal. Rptr. 3d 232, 237 (Ct. App. 2016) ("[T]here is nothing in *Padilla . . .* that compels a trial court to specifically advise on asylum or cancellation of removal.").

The majority cites only one decision, *State v. Favela*, 343 P.3d 178 (N.M. 2015), to try to demonstrate that the duty recognized in *Padilla* includes an explanation of "the specific consequences beyond deportation." In that case, the New Mexico Supreme Court did note in passing that trial counsel may be held ineffective for failing to advise a client of "the 'specific immigration consequences of pleading guilty.' " *Id.* at 182 (quoting *State v. Paredez*, 101 P.3d 799, 805 (N.M. 2004)). However, *Favela* is easily distinguishable. The main focus in that case was the *prejudice* prong of *Strickland*—i.e., how a judicial admonition during plea proceedings or the weight of the evidence in the case could affect any prejudice analysis. *Id.* at 179. But more to the point, *Favela* contains no discussion of *Padilla* and instead relies only on its own pre-*Padilla* precedent, *State v. Paredez*, 101 P.3d at 538–39. It's worth noting that the Maryland Court of Appeals recently distinguished *Favela* on similar grounds, because "in general, the New Mexico standard [is] a higher standard than that in *Padilla*." *State v. Sanmartin Prado*, 141 A.3d 99, 129–30 (Md. 2016).

My initial reaction is that the approach taken in cases like *Garcia* makes more sense. "[P]redicting the exact likelihood of enforcement may

prove difficult for a criminal defense attorney who has only limited experience, if any, with immigration authorities." *Budziszewski v. Comm'r of Corr.*, 142 A.3d 243, 250 (Conn. 2016). Unlike *Padilla* itself, today's standard cannot be met by basic legal research, but instead imposes a duty on criminal defense counsel to get up to speed on immigration law generally.

I seriously question whether the State Public Defender's Office has the resources to meet the new duty fashioned by today's decision. Appointed counsel will have to advise noncitizen defendants not only on the likelihood of deportation, but also on other legal consequences that may result from the deportation, potentially months or years later. I fear there will need to be a phalanx of immigration lawyers on call.

And today's decision could tax our own judicial system as well. For example, will we see a slew of postconviction relief proceedings filed by defendants who received *Padilla*-compliant advice on deportation but were not told about one or more other immigration consequences?

For all these reasons, I concur in the result and much of the court's analysis but cannot join Part III.A of the court's opinion.

Waterman and Zager, JJ., join this special concurrence.