**IN THE COURT OF APPEALS OF IOWA**

No. 16-1893
Filed June 6, 2018

**CARLOS RAMIREZ,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Marshall County, John J. Haney,

Judge.

The applicant appeals from the denial of his application for postconviction

relief. **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

Benjamin D. Bergmann and Alexander Smith of Parrish Kruidenier Dunn

Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee State.

Considered by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**POTTERFIELD, Judge.**

Carlos Ramirez appeals from the district court's denial of his application for postconviction relief (PCR). As he did in his PCR application, Ramirez maintains he received ineffective assistance from trial counsel. Specifically, he maintains counsel was ineffective by failing (1) to ensure Ramirez's written guilty pleas conformed to Iowa Rule of Criminal Procedure 2.8(2)(b); (2) to advise him adequately of the immigration consequences of his pleas; and (3) to mitigate the immigration consequences. Alternatively, Ramirez asks us to apply a new prejudice standard under the Iowa Constitution if we find that Ramirez has failed to establish prejudice under the well-known *Strickland*[1] standard or to determine the failure to inform a defendant adequately of immigration consequences constitutes "structural error," allowing Ramirez to succeed without having to establish how he was prejudiced.

**I. Background Facts and Proceedings.**

Ramirez was born in the Dominican Republic in 1976. He immigrated to the United States in 2003. At the time he was charged by trial information, in October 2011, Ramirez was a legal permanent resident of the United States and had been for a number of years. Additionally, he had six children[2] who were either residents or citizens of the United States.

Ramirez was charged by trial information with two counts of child endangerment, one count of harassment in the first degree, and one count of

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).
[2] Ramirez had six children who lived in the United States at the time he was charged; by the time he entered his guilty pleas, he was expecting his seventh.

domestic abuse assault causing bodily injury. It was alleged Ramirez had hit his wife with a closed fist—leaving a bruise on his wife's bicep—while she changed the diaper of their two-year-old child. Then, after his wife began packing a bag to leave the residence, Ramirez laid on the couple's bed near their one-year-old child while holding a knife and told his wife he would kill the child before he let her leave with the children. His wife reported Ramirez frequently told her he was going to kill her.

In a second trial information, Ramirez was also charged with one count of child endangerment and one count of harassment in the first degree. It was alleged Ramirez had struck his two-year-old child and had again threatened to kill his wife.

In May 2012, Ramirez entered a written guilty plea to two counts of child endangerment and one count of domestic abuse causing bodily injury; the State agreed to dismiss the other pending charges. The written plea form contained the following sentence, "I understand that a criminal conviction, deferred judgment or deferred sentence will affect my status under federal immigration law."

Ramirez was sentenced to concurrent two-year sentences for each conviction for child endangerment and a one-year sentence for his conviction for domestic abuse assault. All but seventy-five days of each sentence was suspended, which Ramirez had discharged with time served before his guilty pleas.

Ramirez did not appeal the judgment or sentence.

In May 2014, Ramirez filed a timely petition for PCR. In his petition, Ramirez claimed his trial counsel had provided ineffective assistance when she failed to advise Ramirez of potential deportation consequences of his guilty pleas.

The petition was not heard until August 2016. At the hearing, Ramirez called an immigration attorney, Nikki Mordini, as an expert witness. Mordini testified as to the differences between "removability"—when a person is subject to being deported or ejected from the country—and "inadmissibility"—when a person would be prevented from legally reentering the country or, while still in the United States, would become ineligible for certain types of relief. While legal permanent residents may apply for cancellation of removal—which allows for cancellation of the removal process even after conviction of an otherwise removable crime— anyone convicted of an aggravated felony (as defined by the Immigration and Nationality Act) is ineligible for the cancellation. Mordini testified aggravated felony convictions are often referred to as "the death penalty of immigration cases" because a conviction carries such severe immigration consequences. While crimes involving moral turpitude can be more ambiguous, crimes that constitute aggravated felonies are listed in the statute. Additionally, some crimes are considered aggravated felonies because of the conduct or type of crime, such as situations where a crime includes violence, and other crimes are considered aggravated felonies because the non-citizen was sentenced to a term of incarceration of one year or more.

Mordini was asked what she would tell a non-citizen client who was pleading guilty to an aggravated felony about the immigration consequences, and she stated, in part:

> If it appears there were no options for avoiding the aggravated felony, my advice to the client would be that you will be removed. The aggravated felony means that you are deportable. It means that once placed in deportation proceedings that you are subject to mandatory detention, which means that you are not eligible for a

bond while the deportation case is pending. An aggravated felony means that if you're removed based on that aggravated felony that you are permanently barred from returning to the U.S. It means that you are permanently barred from becoming a U.S. citizen, even if there's some way that you're able to stay. And there are just—there are numerous consequences based on that aggravated felony conviction. But first and foremost is that you will be removed.

Ramirez's trial counsel was also called to testify at the PCR hearing. At the hearing, she testified she told Ramirez in several conversations he would or could be deported if he pled guilty. Additionally, the following exchange took place between PCR counsel and trial counsel:

> Q. You do understand that you're required to advise a client if there are clear immigration consequences, right? A. I believe that my obligations are to let them know to the best of my ability and to advise them to seek the advice of an attorney who can provide them with specific advice about immigration.
> Q. So you would agree that you are not able to give advice about immigration consequences. A. Yes.
> Q. You did not know whether or not there were unambiguous immigration consequences to Mr. Ramirez pleading guilty, did you? A. I believe that any charge that is a domestic abuse or child endangerment will carry immigration consequences. I don't know whether they're ambiguous or unambiguous. I'm not well-versed on immigration law.
> Q. Do you remember when I took your deposition . . . [a]nd I asked you, "So it's fair to say that then when you represented [Ramirez] you did not know whether or not there were unambiguous consequences, correct?" A. And my answer was, "I guess not."
> Q. You didn't determine whether any of the charges to which Mr. Ramirez was pleading guilty were aggravated felonies, did you? A. No.
> . . . .
> Q. Was it ever ambiguous to you about whether or not [Ramirez] wanted to stay in the United States? A. He wanted to stay.
> Q. Were his children important to him? A. Very important.
> Q. You didn't determine whether any of the charges Mr. Ramirez—to which Mr. Ramirez pleaded guilty were crimes involving moral turpitude, did you? A. No, not specifically.
> Q. Your advice was that the charges could perhaps lead to deportation, correct? A. I had several conversations with him over the course of this case, and there were several times that I said to him, these cases—if you plead guilty to any of these charges or are

found guilty to the charges that the guilty plea—the plea agreement was, I told him you were—he was going to be deported.

Q. It would be fair to say that your answer has vacillated somewhat as to whether or not you said he would be deported or could be deported? A. That's true. Although we had several different conversations.

Q. Although it makes a big difference to Mr. Ramirez whether you're saying could or would, right? A. Perhaps it does, yes.

Trial counsel also testified she was "surprised to see" Ramirez at the PCR hearing because she thought he would be deported. She expounded:

Why I thought he would be deported? He was pleading guilty to a domestic abuse assault and two child endangerment charges, both of which are the—the two child endangerment charges are considered by the federal government to be felonies even though in Iowa they are misdemeanors, aggravated misdemeanors. But because of the maximum length of sentences they were considered to be felonies.

Later, in response to another question about what she had told Ramirez before he entered his guilty pleas, she stated:

We talked a number of times, and I know that at several points I said buddy, if you accept this, you're going to be deported. And I know—I'm not trying to—I mean, probably used the word "would" or "could." So I—But I know sometimes I said to him you're going to be deported, and I know I was very clear that this was something that was going to be—going to cause him a lot of problems.

Ramirez also testified at the hearing, stating his trial counsel had not told him that his guilty plea to either domestic abuse assault or child endangerment would render him inadmissible to the United States. He also testified that he was not told his convictions would result in deportation and that if he had been told, he would not have pled guilty. He claimed he was innocent of the charges. He agreed that in deciding to plead guilty, he considered the fact that he would not have to spend additional time in jail and that some charges were being dismissed; however, he maintained that he was concerned about being deported because he

would not be able to see his children. He claimed that he pled guilty because his trial attorney told him he would get his children back if he did so—they had been placed in a foster family and had a no-contact order against Ramirez at the time he pled guilty.

At the close of evidence, Ramirez's PCR counsel also raised the issue that his trial counsel had been ineffective when she allowed him to plead guilty with a guilty plea form document that did not comply with Iowa Rule of Criminal Procedure 2.8(2)(b). The rule requires that the written guilty plea document "includes a statement that conviction of a crime may result in the defendant's deportation or other adverse immigration consequences if the defendant is not a United States citizen."

In its written ruling, the PCR court denied Ramirez's petition, ruling that the sentence on the written guilty plea and the trial attorney's "several conversations with Ramirez about the immigration consequences of pleading guilty or being found guilty of the charges of child endangerment and domestic abuse" "comports with the requirements established in" *Padilla v. Kentucky*, 559 U.S. 356, 368 (2010). Additionally, the court found that Ramirez could not establish that he was prejudiced by any alleged errors because "[t]he record does not contain credible evidence that Ramirez would have received a more favorable outcome if he had gone to trial."

Ramirez appeals.

## II. Standard of Review.

"Although '[w]e typically review postconviction relief proceedings on error,' we review ineffective-assistance-of-counsel claims de novo." *Diaz v. State*, 896

N.W.2d 723, 727 (Iowa 2017) (quoting *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001)). "Ineffective-assistance-of-counsel-claims require a showing by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." *Id.* (citation omitted).

**III. Discussion.**

We begin with Ramirez's claim that he received ineffective assistance when trial counsel failed to inform him adequately of the immigration consequences involved with his guilty pleas.

The Sixth Amendment to the United States Constitution guarantees a defendant a "right to the effective assistance of counsel," which includes the right to effective assistance at "that critical stage of the prosecution in which a defendant considers pleading guilty to the charges." *Id.* Counsel provides ineffective assistance when he or she breaches an essential duty and the defendant is prejudiced as a result. *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012). "To establish counsel provided constitutionally deficient representation, the defendant must establish counsel's representation 'fell below an objective standard of reasonableness.'" *Diaz*, 896 N.W.2d at 728 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). "We look to 'the practice and expectations of the legal community' in defining this standard." *Id.* (quoting *Padilla*, 559 U.S. at 366). If the defendant makes the requisite showing under the first prong, then the defendant must show he or she would not have pled guilty and instead would have insisted on going to trial in order to establish that counsel's failure resulted in prejudice. *Id.* Importantly, "[t]his does not mean the defendant must show he or she would have prevailed at trial." *Id.* at 729. "Rather, the defendant must only show the 'decision

to reject the plea bargain would have been rational under the circumstances.'" *Id.* (quoting *Padilla*, 559 U.S. at 372).

"It is a duty to provide competent and thorough advice, to represent the client's interests with vigor and diligence, and to fulfill those 'anxious responsibilities' with which we have entrusted the bar." *Id.* at 727–28 (citation omitted). This duty "exists separate from the colloquy engaged in by the district court under Iowa Rule of Criminal Procedure 2.8." *Id.* at 728. "An attorney fails to fulfill this duty when the attorney fails to advise a client of the immigration consequences of a plea." *Id.* "Changes in immigration law have increased enforcement and reduced discretion in the event of a criminal conviction." *Id.* "These changes have shifted the responsibility to protect immigrants from potential inequities in the immigration system to criminal defense counsel." *Id.*

Here, the State concedes that trial counsel breached her duty to Ramirez if *Diaz* is the law. However, the State maintains that the *Padilla* controls what advice was reasonable at the time Ramirez entered his plea. We disagree. *Diaz* is not a change in law but rather an application of the existing law found in *Padilla*. *See Diaz*, 896 N.W.2d at 730 (stating the court must answer the "vexing question [of] the extent to which counsel must advise the specific consequences beyond deportation" in order "to complete the analysis in *Padilla* and address the State's argument that [defendant's] counsel was not required to advise him on anything other than the risk of deportation," and recognizing how other courts have "read" *Padilla*).

In *Padilla*, the Court considered whether counsel's representation fell below an objective standard of reasonableness when counsel failed to inform the non-

citizen defendant about possible immigration consequences to pleading guilty to the transportation of a large amount of marijuana. 559 U.S. at 359. The Court found that "constitutionally competent counsel would have advised [Padilla] that his conviction for drug distribution made him subject to automatic deportation." *Id.* at 360. Additionally, the court reiterated, "'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable.'" *Id.* at 366 (alteration in original) (quoting *Strickland*, 466 U.S. at 688). The court then proceeded to find that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* at 367.

In *Diaz*, our supreme court applied the same standard, noting that counsel is required to provide competent advice, as determined by contemporaneous professional norms. *See Diaz*, 896 N.W.2d at 727–29. The court noted that while *Padilla* ultimately required counsel to advise a defendant of deportation consequences when they were clear under the statute or to simply advise of possible immigration consequences when they were not clear, the court did "not believe the Court [in *Padilla*] intended to create a new standard for determining effective assistance of counsel or to limit the advice of counsel to exclude a full explanation of the various immigration consequences of pleading guilty." *Diaz*, 896 N.W.2d at 730. "Instead, counsel after *Padilla* is held to the same standard counsel was before *Padilla*: to provide objectively reasonable assistance as measured by prevailing professional norms." *Id.* Our supreme court then

considered the "proliferation of reference guides since the *Padilla* decision" before recognizing "that counsel has an obligation to inform his or her client of *all* the adverse immigration consequences that competent counsel would uncover." *Id.* at 731, 732 (emphasis added). "[C]lients expect their counsel to conform to the 'practice and expectations of the legal community,' which in this case is an expectation enhanced by vast professional support." *Id.* at 732 (citation omitted). Thus, the question is not whether *Padillia* or *Diaz* applies, but what the prevailing professional norms were in 2012 when trial counsel advised Ramirez regarding the possible immigration consequences of his guilty plea.

Here, even if we found a reasonably competent attorney would not, in 2012, have uncovered the immigration consequences associated with removal, "such as exclusion, denial of citizenship, immigration detention, and bar to relief from removal," *Diaz*, 896 N.W.2d at 729, counsel breached her duty to give clear advice. Like the statement in the outdated guilty plea form used by counsel, the immigration advice provided by counsel was general and ambiguous. At the PCR hearing, trial counsel agreed her advice to Ramirez vacillated between whether he "could" or "would" be deported; however, "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for [Ramirez's] conviction." *Padilla*, 559 U.S. at 368; *see also* 8 U.S.C. § 1227(a)(2)(E)(i) ("Any alien who at any time after admission is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment is deportable."). Additionally, she testified she knew the charges of domestic abuse or child endangerment "will carry immigration consequences" but did not "know whether they're ambiguous or unambiguous."

Similarly, when she was deposed, she was asked if she knew at the time she represented Carlos whether there were unambiguous consequences, and she responded, "I guess not."

The deportation consequence was not the only misleading advice given by trial counsel. Counsel breached an essential duty when she failed to advise Ramirez that his reentry to the United States after deportation would be barred due to his guilty pleas. *See Diaz,* 896 N.W.2d at 731 ("Counsel's duty as interpreted in *Padilla* does not depend on an assessment of the clarity of the consequences or on categorizing them as strictly related to deportation."); *see also* ABA Standards for Criminal Justice: Prosecution Function and Def. Function 4-5.5(c) (4th ed. 2015) ("After determining the client's immigration status and potential adverse consequences from the criminal proceedings, including removal, exclusion, bars to relief from removal, immigration detention, denial of citizenship, and adverse consequences to the client's immediate family, counsel should advise the client of all such potential consequences and determine with the client the best course of action for the client's interests and how to pursue it."). "[C]ounsel has an obligation to inform his or her client of all the adverse immigration consequences that competent counsel would uncover." Pursuant to federal statutes, Ramirez's guilty pleas render him inadmissible. *See* 8 U.S.C. § 1182(a)(9)(ii).

Next, we must determine whether Ramirez has established he was prejudiced by counsel's failure to provide correct advice about the immigration consequences of his guilty plea. In this context, Ramirez is required to show he would not have pled guilty and instead would have insisted on going to trial. *Diaz,* 896 N.W.2d at 728. The district court concluded that Ramirez had failed to meet

his burden because "[t]he record does not contain credible evidence that Ramirez would have received a more favorable outcome if he had gone to trial." But such a showing is not necessary. *See id.* at 729 ("This does not mean the defendant must show he or she would have prevailed at trial.") "Rather, the defendant must only show the 'decision to reject the plea bargain would have been rational under the circumstances.'" *Id.* (quoting *Padilla*, 559 U.S. at 372).

Based on the record established at the PCR hearing, we believe Ramirez's contention that he would have insisted on going to trial if he had been informed that he would be deported and barred from reentry if he pled guilty to the charges. Ramirez has seven children who reside in the United States and none who live in the Dominican Republic, where he was born. He has been adamant that his children's presence in the U.S. was critical to his decision to plead guilty. *See id.* at 734 (concluding the record supports a finding of prejudice because the defendant had a child in the country and "[b]y pleading guilty, he all but guaranteed he would never be physically present in her life to help her grow. If he had not pled guilty, he could have defended himself at trial."). Ramirez maintained he only entered his guilty plea because he believed his children would be returned to him if he did so. Additionally, trial counsel agreed that staying in the United States was very important to Ramirez. At the PCR hearing, Ramirez maintained that he was actually innocent of the charges to which he pled guilty. While Ramirez received apparent benefits to pleading guilty by having multiple charges dismissed and spending no additional time in jail, "an unauthorized alien may rationally choose to reject a plea deal for the same reasons a U.S. citizen might." *Id.* at 733. And if he had been correctly advised of the immigration consequences, Ramirez could have

"rationally decided to hold the State to its burden of proof." *Id.* at 734. Finally, while trial counsel maintained Ramirez decided to plead guilty because "he had another child" and a "new girlfriend," "was going to move somewhere in Illinois," and "had just decided to go on his with his life," we believe such a statement instead supports Ramirez's contention he would have insisted on going to trial if he was properly told the consequences of the pleas.

Because counsel failed to advise Ramirez adequately of the immigration consequences of his guilty pleas and Ramirez has established that it would have been rational to reject the plea agreement and go to trial if he had been properly informed and that he would have made that decision, Ramirez received ineffective assistance from trial counsel. We remand this case to the district court to allow Ramirez to withdraw his plea and stand for trial.[3] *Id.*

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

---

[3] Because we find this issue dispositive, we need not consider Ramirez's other claims, including his argument for different standards under the Iowa Constitution.