# IN THE COURT OF APPEALS OF IOWA

No. 18-0134
Filed July 24, 2019

**JESSIE JAMES JONES,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Clinton County, Tom Reidel, Judge.

The applicant appeals the denial of his application for postconviction relief, following his conviction for sexual abuse in the second degree. **AFFIRMED.**

Stuart G. Hoover of Blair & Fitzsimmons, P.C., Dubuque, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee State.

Considered by Potterfield, P.J., and Tabor and Bower, JJ.

**POTTERFIELD, Presiding Judge.**

Jessie Jones appeals the denial of his application for postconviction relief (PCR) following his conviction of sexual abuse in the second degree. Jones claims the PCR court abused its discretion in denying his application for the appointment of an expert to testify in his PCR hearing regarding the standard of professional conduct for attorneys. Additionally, Jones argues his PCR application should have been granted because his trial counsel breached an essential duty by (1) failing to call an expert to emphasize the lack of rape-kit evidence; (2) failing to contest evidence of Jones's DNA found on the complaining witness's "wrong" underwear or explain the limitations to DNA evidence; (3) failing to challenge whether the jury panel was made up of a fair cross section of the community; (4) wrongly advising Jones regarding possible impeachment based on his prior convictions and, as a result, wrongly advising Jones not to testify in his own defense. He asks that we consider the cumulative effect of trial counsel's errors.

**I. Background Facts and Proceedings.**

In fall 2010, Jones was charged with three counts of sexual abuse in the second degree. In each of the counts, it was alleged Jones perpetrated sex acts on nine-year-old A.E.-S.

A jury trial took place over two days in March 2011. At the trial, A.E.-S, who was a child in the home Jones had been living in during the relevant time periods, testified Jones pulled her down onto the air mattress Jones was using as a bed in the family living room, pulled down her pants and underwear, and "stuck his nasty part in her butt." A.E.-S estimated Jones did so for four or five

minutes. Afterward, A.E.-S grabbed a phone and hid under her bed. A.E.-S. called her mother but was too hysterical for her mother to understand anything other than that A.E.-S was saying something about Jones. A.E.-S.'s mother called another one of her children—A.E.-S.'s older sister—and asked her to go home to check on A.E.-S. When the older sister, the older sister's friend, and the adult who had been driving them arrived at the home, they found A.E.-S. under the bed crying. She told them, "[Jones] raped me again." Once A.E.-S.'s stepfather arrived home, he checked A.E.-S. for any serious external injuries before ultimately deciding to drive her to the emergency room himself rather than calling for an ambulance.

A.E.-S. was seen by a doctor and nurse at the hospital; the medical records indicate medical professionals did an external exam and reported, "Normal genitalia for age, no tenderness, no lesions, no obvious injury." A sexual-assault exam was not completed because a police officer who came to the hospital in response to the allegation of sexual assault, after speaking to a worker from the department of human services, advised medical personnel not to complete an exam as one would be completed at a Child Protection Center (CPC) later. At trial, the officer admitted this was a mistake, as A.E.-S. was not seen at a CPC for a number of days.

A police officer followed A.E.-S. and her mother home from the hospital and asked A.E.-S. to provide the clothes she was wearing at the time of the assault. A.E.-S. went to her room and retrieved a pair of polka-dot leggings, pink underwear, a shirt, and a sweatshirt. The officer also took the bedding from the air mattress.

The clothing—but not the bedding—was later tested for the presence of seminal fluid at the Iowa Department of Criminal Investigations. The inside crotch of the underwear given to the officer tested positive for the presence of semen, from which a DNA sample was taken. The criminalist who completed the testing testified that he was able to match sixteen out of sixteen DNA fragments from the sample from the underwear with the sample taken from Jones at the police station. The criminalist testified fewer than one out of 100 billion would be expected to have the same profile.

After the State rested, Jones moved for a judgment of acquittal, which the district court granted as to two of the three counts of sexual abuse in the second degree.

The defense did not present any evidence; outside the presence of the jury, defense counsel made the following record with Jones:

> Q. Mr. Jones, you understand that you have an absolute right to testify on your own behalf if you want to? A. Correct.
> Q. You also understand that you have an absolute right not to testify if you chose not to? A. Correct.
> Q. And I can make recommendations and suggestions to you, but you understand that ultimately the decision is yours to make? A. Correct.

The jury found Jones guilty of the remaining count of sexual abuse in the second degree. He was later sentenced to a term of incarceration not to exceed twenty-five years.

Jones filed a direct appeal of his conviction, arguing his trial counsel provided ineffective assistance by not objecting to prosecutorial misconduct during the State's closing statement. A panel of our court found that Jones failed to establish either a breach of duty by counsel or resulting prejudice and affirmed

Jones's conviction. *See State v. Jones*, No. 11-0730, 2012 WL 666740, at *3 (Iowa Ct. App. Feb. 29, 2012).

Jones filed his PCR application in 2013; he amended it a number of times before it came on for hearing in October 2017.

In May 2017, Jones filed a motion asking the court for permission to retain an expert at the state's expense. In the motion, Jones asserted, "Expert testimony is necessary to testify as to the actions of the applicant's criminal defense attorney and whether those actions and the quality of representation met the *Strickland* standard." He named the expert he wished to hire and stated the expert was prepared to "testify as to whether the applicant's criminal defense attorney provided constitutionally effective representation to the applicant at the time of the criminal trial."

The PCR court denied the motion, stating:

Applicant has been appointed counsel to review the case and the law and to set forth arguments regarding trial counsel's performance and any prejudice that may have resulted. The court as the trier of fact is to determine whether applicant has satisfied this burden. The court finds that the expert testimony is not useful in this matter. The expert will not testify to anything that PCR counsel cannot include in his brief.

Following a hearing on the PCR application, the PCR court denied each of Jones's claims of ineffective assistance by trial counsel.

Jones appeals.

## II. Discussion.

### A. Application for Appointment of Expert.

Jones maintains the PCR court abused its discretion in denying his motion to hire an attorney to testify as an expert regarding whether trial counsel

breached any essential duties or *Strickland* prejudice resulted. *See Linn v. State*, ___ N.W.2d ___, ___, 2019 WL 2482511, at *9 (Iowa 2019) (stating, in review of a PCR action, "We review decisions on appointment of an expert for an abuse of discretion.").

Iowa Code section 822.5 (2017) provides that "the costs and expenses of legal representation shall also be made available to the applicant in the preparation of the application, in the trial court, and on review if the applicant is unable to pay." "We believe that provision necessarily authorizes appointment of an expert at state expense to those unable to pay because an expert may be required for the legal representation provided for under the provision." *Linn*, 2019 WL 2482511, at *27.

However, "[i]n order for the PCR court to grant a motion for appointment of an expert, there must be a reasonable need for expert services." *Id.* On appeal, Jones reiterates that he wanted an expert to testify at his PCR hearing regarding "the proper standard of professional conduct or what qualifies as an 'essential duty' and whether defense counsel's performance failed to meet those requirements." He does not explain why his requested expert—another defense attorney—is able to provide unique insight into this common legal issue. We can imagine a scenario where testimony establishing "the practice and expectations of the legal community" could aid the court in reaching its decision. *See Diaz v. State*, 896 N.W.2d 723, 731 (Iowa 2017) (recognizing a change in professional norms requiring attorneys to better and more fully inform their clients regarding possible immigration consequences in recent years). But one attorney's opinion that another attorney's actions prejudiced his client is not an appropriate form of

expert testimony. *See In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005) ("[A] witness cannot opine on a legal conclusion or whether the facts of the case meet a given legal standard."), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 (Iowa 2016).

Based on the record we have before us, we cannot say the PCR court abused its discretion in denying Jones's request for the appointment of another attorney to act as a legal expert regarding his claims of ineffective assistance.

**B. Ineffective Assistance of Trial Counsel.**

Jones asserts a variety of ways in which he maintains his trial counsel provided ineffective assistance. We review PCR claims of ineffective assistance de novo. *See Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

To succeed, Jones has the burden to "show that (1) counsel failed to perform an essential duty, and (2) prejudice resulted." *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012) (citation omitted). He "must prove both the 'essential duty' and 'prejudice' elements by a preponderance of the evidence." *Id.* We presume trial counsel acted competently, and we avoid second-guessing and hindsight. *Ledezma*, 626 N.W.2d at 142. In considering whether Jones met his burden under the prejudice prong, we look to the cumulative effect of trial counsel's errors. *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012).

**1. Rape-Kit Evidence.**

Jones claims his trial counsel provided ineffective assistance by failing to call an expert to emphasize the lack of rape-kit evidence. On appeal, Jones asserts the hospital's failure to complete a rape kit, after A.E.-S.'s stepfather specifically requested one, "is a huge gap in the State's case that should have

been investigated and emphasized as part of a reasonable defense." He continues, "Expert testimony from a [sexual assault nurse examiner (SANE)] would have shown that the rape kit needs to be performed immediately or the evidence is lost." Insofar as Jones argues more should have been made of the fact that a rape kit was not completed in this case, the issue was raised a number of times—by both the prosecutor and Jones's trial attorney. At least two members of law enforcement who were part of the investigation admitted the failure to complete the rape kit was a mistake, and both the prosecutor and Jones's trial counsel emphasized the fact during their closing arguments.

Jones maintains an expert should have been called to testify as to what actions could been done as part of a rape kit and what findings those actions may have provided. On appeal, Jones speculates what some of those findings may have been and argues "[e]ach of these missing pieces of evidence could potentially exonerate" him. He claims expert testimony was necessary "to explain how each of these missing pieces of evidence was significant and why it was so important that the rape kit was timely performed." Jones's argument is entirely speculative; he has not yet produced an expert to testify how he posits an expert would have testified at trial. *See Taylor v. State*, 352 N.W.2d 683, 687 (Iowa 1984) (considering a claim of ineffective assistance based on the idea counsel should have called other witnesses and evaluating whether the applicant "has adequately shown the nature of the testimony that the[] witnesses would have given"); *Luke v. State*, 465 N.W.2d 898, 902 (Iowa Ct. App. 1990) ("[The applicant] does not present evidence the witnesses would have, in fact, testified

in this manner. . . . [W]e are not persuaded by [his] speculation."). Jones has not established trial counsel breached an essential duty.[1]

### 2. DNA Evidence.

Jones claims trial counsel provided ineffective assistance by failing to point out that the lab tested the "wrong" underwear for DNA. Jones maintains the pink underwear[2] the lab tested was not the same underwear A.E.-S. was wearing that day. He bases this claim on A.E.-S.'s statement during the CPC interview in which she describes the underwear as orange and A.E.-S.'s stepfather's testimony that A.E.-S. did not change her clothing before going to the hospital. Jones claims the pink underwear A.E.-S. gave to police came from the dirty laundry and maintains he has an explanation for how those underwear had his DNA on the inside of them.

Although A.E.-S.'s stepfather testified A.E.-S. did not change her clothing between the time of the assault and leaving for the hospital, he was not home at the time of the assault and ultimately admitted he did not know whether she

---

[1] Although Jones states that he must establish *Strickland* prejudice, he also cites authority discussing the presumption of prejudice in cases of structural error. *See State v. Feregrino*, 756 N.W.2d 700, 706 (Iowa 2008); *see also Lado v. State*, 804 N.W.2d 248, 252 (Iowa 2011) (discussing structural error and noting no showing of prejudice is required because the process is "presumptively unreliable"). We understand Jones's passing reference to structural error to be inadvertent and do not consider it in our analysis.

[2] We do not have the actual underwear—which was admitted into evidence at the criminal trial—in the record before us. We acknowledge we have in our record a photo attached to Jones's reply brief, which was filed with the PCR court in November 2017, showing a pair of pink underwear, but it does not appear the photo was admitted as an exhibit at either the criminal or PCR trial, and we have no information as to the authentication or foundation of the photograph. Therefore, we do not rely on or consider the photograph.

Because a number of witnesses, as well as the criminalist who tested the underwear for DNA, described the underwear as pink at trial with no objection or dispute, we proceed with our analysis under the assumption the record is as described.

changed before he arrived home. Additionally, the night of the incident, A.E.-S. told her mother that she had changed before going to the hospital, which led the officers to follow them home to obtain the clothing she had been wearing. A.E.-S. and her older sister's friend—who arrived with the older sister to check on A.E.-S. after being asked to do so by A.E.-S.'s mother—both testified A.E.-S. changed her clothes before going to the hospital.

At the CPC interview six days after the incident, A.E.-S. described the underwear she was wearing at the time of the assault as orange, and by the time of trial almost ten months later, she admitted she did not recollect the color of the underwear at all. But when the police came to her home a few hours after the incident and asked for the clothing she was wearing, A.E.-S. did not hesitate to pick up the pink underwear from her floor—underwear that ultimately tested positive for seminal fluid containing DNA that was a sixteen out of sixteen match to Jones's DNA.

Jones asserts his trial counsel should have emphasized the fact that the lab tested the wrong underwear. But his trial counsel could reasonably believe it would do more harm than good to emphasize to the jury that a different pair of A.E.-S.'s underwear—ones Jones maintains are unrelated to A.E.-S.'s recounting of when Jones "stuck his nasty part in her butt"—contained Jones's DNA on them. This is especially true in light of the fact that Jones was on trial for three counts of sexual abuse in the second degree—two of which counsel successfully moved for judgment of acquittal.

We cannot say trial counsel breached in essential duty by not arguing the lab tested the wrong underwear. *See Ledezma*, 626 N.W.2d at 143 ("[C]laims of

ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment.").

### 3. Fair Cross Section.

The Sixth Amendment to the United States Constitution entitles a criminal defendant to a jury panel[3] designed to represent a fair cross section of the community. "A systematic exclusion of 'distinct' segments of the community violates the constitutional requirement." *State v. Jones*, 490 N.W.2d 787, 792 (Iowa 1992), *overruled on other grounds by State v. Plain*, 898 N.W.2d 801, 826 (Iowa 2017). Jones maintains his trial counsel provided ineffective assistance by failing to challenge his all-Caucasian jury panel.

In order to establish a prima facie fair-cross-section violation, Jones would have to show:

> (1) [T]hat the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* At his PCR hearing, Jones established that the jury panel for his criminal trial consisted of thirty-four individuals, all of whom are Caucasian. According to the data admitted into evidence at the PCR court, African Americans made up 2.6%

---

[3] Pursuant to Iowa Code section 607A.3, a "jury pool" is "the sum total of prospective jurors reporting for service," while a "panel" is "those jurors drawn or assigned for a service to a courtroom, judge, or trial. Jones seems to discuss jury venires, pools, and panels interchangeably, but based on what Jones told the PCR court—that he walked into the courtroom of potential jurors before his criminal trial and immediately alerted his trial counsel that he wanted him to make a fair-cross-section challenge because there were not any potential black jurors—he is challenging the jury panel.

of Clinton County's population in 2010—the census completed closest in time to Jones's 2011 trial. Jones broadly maintains that competent counsel would challenge an all-Caucasian jury panel. But Jones does not provide any evidence of or even make an assertion that the underrepresentation present in his case is "due to systematic exclusion of the group in the jury-selection process."

We recognize our supreme court's more-recent case law on this issue. In *Plain*, the court noted, "Empirical evidence overwhelmingly shows that having just one person of color on an otherwise all-white jury can reduce disparate rates of convictions between black and white defendants." 898 N.W.2d at 825–26. But still, the defendant challenging the jury panel is required "to show causation, that is, that underrepresentation is produced by some aspect of the system." *State v. Lilly*, ___ N.W.2d ___, ___, 2019 WL 2236099, at *10 (Iowa 2019). Jones has not done so here. And because we cannot say trial counsel would have been successful in making a fair-cross-section challenge, we cannot find he breached a duty in failing to do so. *See State v. Carroll*, 767 N.W.2d 638, 645 (Iowa 2009) ("[C]ounsel has no duty to pursue a meritless issue.").

### 4. Advice Not to Testify.

Jones maintains counsel breached an essential duty when counsel advised him not to testify in his own defense based on counsel's incorrect belief Jones would be impeached by a prior criminal offense.

The PCR court determined that trial counsel was incorrect in his understanding that Jones could have been impeached by his 1987 conviction for the sale of narcotics because "a drug-related conviction from 1987, even if it was serious in nature, would not have sufficient probative value to outweigh its

prejudicial effect on the accused." *See* Iowa R. Evid. 5.609.[4] The court determined trial counsel breached an essential duty in either failing to file a motion in limine to keep the evidence of the 1987 conviction out or misadvising Jones regarding the State's ability to impeach him if he testified.

But the PCR court went on to conclude Jones could not establish prejudice. Trial counsel's decision to advise Jones against testifying was based not only on counsel's mistaken belief regarding impeachment but also because, at the time of trial, Jones's explanation for why his DNA was found on A.E.-S.'s underwear was that he masturbated and then wiped his penis with A.E.-S.'s underwear.[5] The PCR court concluded, "[A]ny reasonable attorney would advise his client not to testify if this were to be his defense in a sexual abuse trial."

Jones argues his conviction was all but certain once counsel encouraged him not to testify in his own defense, leaving the jury without an explanation for

---

[4] At the time of Jones's 2011 criminal trial, Iowa Rule of Evidence 5.609 stated:
> a. *General rule.* For the purpose of attacking the credibility of a witness:
> (1) Evidence that a witness other than the accused has been convicted of a crime shall be admitted, subject to rule 5.403, if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the witness was convicted, and the evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; . . . .
> . . . .
> b. *Time limit.* Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. . . .

[5] At the PCR trial, Jones offered a different explanation for how his seminal fluid ended up on A.E.-S.'s underwear, but the PCR court explicitly found trial counsel's testimony regarding Jones's 2011 explanation as credible. We give weight to the PCR court's credibility finding. *See State v. Shanahan*, 712 N.W.2d 121, 131 (Iowa 2006).

how his DNA ended up on A.E.-S.'s underwear. But as the PCR court recognized, telling the jury Jones chose to masturbate and wipe his penis on A.E.-S.'s underwear was also not a "good" option. We will not "assume the role of Monday morning quarterback in condemning counsel's judgment in choosing between what are frequently equally hazardous options available." *State v. Newman*, 326 N.W.2d 788, 795 (Iowa 1982). Here, counsel pointed out the mistakes made by medical personnel and the police in failing to complete a rape kit at the hospital. In his closing, trial counsel raised questions about the DNA testing, stating:

> Well, I want you to think about the testimony of the criminalist from Des Moines and the copy of his report you're free to look at. And I'm wondering, do you really understand what a polymerase chain reaction is? Was that explained to you? Do you know what it means to amplify 15 short tandem repeat loci and a sexing locus? Was that carefully explained to you what the technology is? You really understand extraction and this, that and the other thing? In other words, he says in his report there's a match. Do you know that? Was the technology explained to your satisfaction? That's a question you can ask yourself.

He also pointed out in closing that the criminalist testified it is better to test DNA evidence sooner rather than later, but no testing was completed until August 24 and 25—almost three months after the underwear was collected. While counsel's strategy was not ultimately successful, "[a]fter a certain course has proven unsuccessful, it is easy to say some other one should have been tried instead." *Id.* "[A] lawyer can only do what the facts and circumstances permit." *Id.*

We cannot say counsel's strategic decision advising Jones not to testify was outside the range of normal competency, even though it was based in part

on a mistaken understanding of whether Jones would be impeached with his prior conviction. *See Ledezma*, 626 N.W.2d at 147 (recognizing counsel's duty to advise the defendant about the consequences of testifying to enable the defendant to make an informed decision and noting "the advice provided by counsel is a matter of trial strategy and will [generally] not support a claim of ineffective assistance absent exceptional circumstances"). Moreover, Jones has not established there is a reasonable probability the outcome would have been different if he testified. *Id.* at 143.

**5. Cumulative Prejudice.**

Jones asks that we consider the cumulative effect of counsel's errors, but here, we have found only one error on the part of trial counsel—misinforming Jones regarding the State's ability to impeach him with his 1987 conviction. As Jones was unable to establish *Strickland* prejudice from this error and there are no other errors to consider, we need not undertake any further analysis.

**III. Conclusion.**

Because the PCR court did not abuse its discretion in denying Jones's request for the appointment of another attorney to act as a legal expert regarding his claims of ineffective assistance and because Jones has not established any of his claims of ineffective assistance of trial counsel, we affirm the denial of his application for PCR.

**AFFIRMED.**