Doe v. United States

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2018

(Argued: October 22, 2018        Decided: February 14, 2019)

Docket No. 17-1841

_____

JOHN DOE,

*Petitioner-Appellant,*

—v.—

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

_____

B e f o r e:

KATZMANN, *Chief Judge*, KEARSE AND CHIN, *Circuit Judges*.

_____

Petitioner-appellant John Doe appeals from a judgment entered in the United States District Court for the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Doe filed a petition for a writ of error *coram nobis* seeking to vacate his earlier

conviction for conspiracy ▮▮▮▮▮▮▮▮. The petition argues that Doe's defense counsel was ineffective in affirmatively assuring him that there should be no immigration consequences for pleading guilty when, in fact, the crime to which he pleaded was an aggravated felony resulting in mandatory removal. The Government joined in Doe's petition after originally opposing it; the district court nevertheless denied the petition. On appeal, Doe argues that the district court applied incorrect legal standards in evaluating the petition and that the court abused its discretion in denying relief. The Government now argues that the district court's decision was not an abuse of discretion. We agree with Doe that the court below erred and that Doe is entitled to relief. Accordingly, the judgment of the district court is **REVERSED** and the case is **REMANDED**.

———————



▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *for Petitioner-Appellant.*

▮▮▮▮▮▮▮▮▮▮▮▮ (argued), Assistant United States Attorneys, *for* ▮▮▮▮▮▮▮, United States Attorney for the ▮▮▮▮▮▮▮▮▮▮▮▮ *for Respondent-Appellee.*

———————

KATZMANN, *Chief Judge*:

Petitioner-Appellant John Doe[1] filed a writ of *coram nobis* in 2014 to vacate a prior conviction. Both the Government and Doe's original attorney admitted that Doe was misled as to the serious immigration consequences of the crime to

———————

[1] Petitioner has been given the pseudonym "John Doe" throughout this litigation to safeguard his identity. All citations to the record in this case have been omitted.

which he pleaded guilty. The Government, after initially opposing the *coram nobis* petition, joined in asking the district court to grant it. The district court nevertheless denied the petition. Troublingly, the Government has now switched positions again, arguing that the district court did not abuse its discretion. On review, we grant the petition.

**BACKGROUND**

Pursuant to a plea agreement, Doe pleaded guilty in ▮▮▮ to a one-count information charging him with conspiracy ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As part of his agreement, Doe consented to cooperate with the Government. Doe was sentenced in ▮▮▮ to ▮▮▮▮▮▮▮▮▮.

In ▮▮▮, Doe filed a petition for a writ of error *coram nobis*. According to the petition, Doe's attorney had assured him that his plea should not result in removal, when in fact the admitted loss amount ▮▮▮▮▮▮ rendered it an aggravated felony, resulting in a lifetime citizenship bar, a conclusive presumption of deportability, and automatic denial of discretionary relief. *See*

8 U.S.C. §§ 1101(a)(43)(M)(i) (defining aggravated felony as including "an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000"), 1101(f)(8), 1227(a)(2)(A)(iii), 1228(c), 1229b(a)(3), 1229b(b)(1)(C), 1427(a). The petition also included an earlier written statement in which Doe's defense attorney admitted that he was ignorant as to immigration law and so was unaware that Doe's conviction would lead to mandatory deportation. He and Doe had relied on the Government's assurances that it would do everything possible to keep Doe in the country.

After his sentencing, Doe applied to renew his green card, at which point he was placed into removal proceedings. The agents with whom Doe had been cooperating referred him to new agents, and Doe agreed to cooperate with them in more sensitive matters. His removal proceedings were then administratively closed. Now aware that he was deportable, Doe sought to vacate his conviction; he was dissuaded by his handlers, who told him they would be able to obtain citizenship for him or have his conviction vacated. With the agents' encouragement, Doe applied for citizenship; this application, however, was denied around ███ or ███. Agents continued to assure him that they would

4

procure him citizenship and to discourage him from discussing a vacatur motion with attorneys. Finally, in ███, Doe recognized that the agents could not actually obtain citizenship for him and contacted a new lawyer.

Doe then filed the instant *coram nobis* petition, after a delay of several months occasioned by the need to retrieve the original criminal complaint against him. The Government initially opposed the petition, asserting that Doe did not meet the standard for *coram nobis* relief because he did not receive ineffective assistance, he was not prejudiced by any ineffective assistance, and his petition was untimely. However, after meeting with Doe, the Government filed a letter with the court withdrawing its opposition. The Government requested that the court (1) grant the *coram nobis* petition and (2) transfer the criminal case to the ██████████████████████████. At a hearing in ████████, the Government informed the court that after examining Second Circuit case law and meeting with Doe—whose story the Government credited—the Government believed that Doe had received ineffective assistance of counsel. Given the circuit law and the factual circumstances, the Government determined that it "could not . . . in good conscience oppose the motion."

5

The district court orally denied the petition, stating that it was "not persuaded." Doe timely appealed the decision, seeking expedited summary reversal. This Court determined that the district court's reasoning could not be discerned from the record; it remanded for the district court to identify the legal standard applied and to explain its reasons for denying relief. The district court then issued a written opinion denying Doe's *coram nobis* petition. The court stated that no "'serious constitutional question' would be raised by withdrawing [Doe's] guilty plea at this stage," and held that a writ of *coram nobis* "hardly seems the remedy in this case, if one is even in order." The court said that "the Executive Branch . . . is requesting that the Judicial Branch remedy what the United States Attorney's Office believes to be a wrong perpetrated by either ICE or the FBI," a request which the court did "not believe . . . to be sound, given the separation of powers doctrine." After the district court issued its decision, Doe reinstated his appeal.

DISCUSSION

## I.    Standard of Review

"A writ of error *coram nobis* is an 'extraordinary remedy'" typically granted only when a prisoner is out of custody and so cannot pursue habeas relief. *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014) (quoting *United States v. Morgan*, 346 U.S. 502, 511 (1954)). We review *de novo* the legal standards that the district court has applied but review for abuse of discretion the court's ultimate decision to deny the writ. *See Porcelli v. United States*, 404 F.3d 157, 158 (2d Cir. 2005).

## II.    Coram Nobis Relief

The sole issue on appeal is whether the district court improperly denied Doe's *coram nobis* petition. While the Government's agreement with Doe below might normally preclude it from opposing Doe now, *see, e.g.*, *Steagald v. United States*, 451 U.S. 204, 209 (1981); *United States v. Gupta*, 699 F.3d 682, 690 n.2 (2d Cir. 2012); *United States v. Canova*, 412 F.3d 331, 347 (2d Cir. 2005), we will exercise our discretion to consider the matter on the merits, *see Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006), bearing in mind the concessions the Government has made both below and on appeal.

To receive *coram nobis* relief, a petitioner must show "that 1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Kovacs*, 744 F.3d at 49 (quoting *Foont v. United States*, 93 F.3d 76, 79 (2d Cir. 1996)).[2] The district court neither laid out nor applied these legal standards. Instead, it cited cases that asked whether "the failure to allow for collateral review would raise serious constitutional questions," a test used to determine whether untimely habeas petitions alleging constitutional violations

---

[2] As the Government does not contest the third factor for receiving *coram nobis* relief, only the first and second factors are at issue here. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). However, we note that Doe's conviction for an aggravated felony, *see* 8 U.S.C. § 1101(a)(43)(M), means that he "shall be conclusively presumed to be deportable," *id.* § 1228(c); *see id.* § 1227(a)(2)(A)(iii), and is ineligible for cancellation of removal or adjustment of status, *id.* § 1229b(a)(3), (b)(1)(C). He is also categorically disqualified from proving moral character, *id.* § 1101(f)(8), which in turn disqualifies him from naturalized citizenship, *id.* § 1427(a). The fact that his deportation proceedings have been administratively stayed does not alleviate these legal consequences, as Doe is still unable to apply for citizenship and remains subject to mandatory removal at any moment if the Government removes the stay. *See Matter of Castro-Tum*, 27 I. & N. Dec. 271, 271 (A.G. 2018) (prohibiting the use of administrative closure in most removal cases and requiring all administratively closed cases to be re-calendared on the motion of either party unless they were closed pursuant to an explicit grant of authority via regulation or judicially approved settlement).

may be brought under 28 U.S.C. § 2241. *Triestman v. United States*, 124 F.3d 361, 377 (2d Cir. 1997). Doe argues that the district court applied the wrong legal standards, and we agree. Under the correct standards, Doe merits relief.

### A.    Ineffective Assistance

Doe claims that his attorney misadvised him as to the immigration consequences of his plea, and that there is a reasonable probability he would have gone to trial, litigated a defense, or negotiated a different plea had he not been misadvised. Ineffective assistance of counsel, including during the plea-bargaining process, is a circumstance compelling the grant of a timely application for *coram nobis* relief. *Kovacs*, 744 F.3d at 49. To prove ineffective assistance, a petitioner must show that "defense counsel's performance was objectively unreasonable" and that "the deficient performance prejudiced the defense." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). "The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed *de novo*." *LoCascio v. United States*, 395 F.3d 51, 54 (2d Cir. 2005) (citation omitted).

9

The Government conceded both in the district court and on appeal that Doe's counsel's actions were objectively unreasonable. They were. At the time of Doe's plea in ███, the Supreme Court had not yet held that attorneys must affirmatively warn their clients of the immigration consequences of their potential convictions. *See Padilla v. Kentucky*, 559 U.S. 356, 369 (2010). However, this court had already held that "an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is . . . objectively unreasonable." *United States v. Couto*, 311 F.3d 179, 188 (2d Cir. 2002), *abrogated on other grounds by Padilla*, 559 U.S. 356.

Doe claims that when he asked his defense counsel about the immigration consequences of the proposed plea agreement, counsel indicated that, with Doe's cooperation and an ultimate plea of guilty in this nonviolent case, Doe should not have a problem with the immigration authorities and should not face deportation. An earlier statement by Doe's defense counsel effectively admitted as much. The statement noted that counsel neither was a practitioner of nor was knowledgeable about immigration law; that he and Doe had been assured by the Government that the Government would do everything it could to keep Doe

10

from being deported; that the attorney and Doe had relied on the Government's representations; and that he had not been aware that deportation was mandatory for the offense to which Doe was considering pleading guilty. The district court made no findings as to the credibility of Doe's or his attorney's representations. The Government, however, has credited Doe's description of the events and of what he was told by government agents, and the Government has admitted that defense counsel effectively conceded that he provided incorrect information to Doe as to whether mandatory deportation would result from his plea. Reviewing the record *de novo*, we conclude that there is no genuine dispute as to the fact that counsel's representations to Doe, which inaccurately conveyed that his plea of guilty to the ███ charge would not make his deportation mandatory, fell below an objective standard of reasonableness. *Couto*, 311 F.3d at 187 (finding ineffective assistance when "counsel affirmatively misled [d]efendant into believing there were things that could be done to avoid deportation").

The question then becomes whether this misadvice prejudiced Doe. The Government asserts that the district court's decision impliedly found a lack of prejudice and claims that this holding was not an abuse of discretion. However,

the court did not make any clear determination regarding whether Doe had met the *Strickland* standard. Instead, applying an incorrect legal test, the court stated conclusorily that "[Doe] has not demonstrated that a 'serious constitutional question' would be raised by withdrawing his guilty plea at this stage, nor that any such constitutional question would be remedied by re-opening the Information or transferring it to the ███████████." We respectfully think the question is not whether *vacating* Doe's conviction would raise a constitutional question, but rather whether allowing his conviction to *stand* would constitute a miscarriage of justice.

Assuming that the district court meant to say that no serious constitutional question would be raised by maintaining Doe's conviction, we believe the court neither employed the correct legal standard nor examined whether Doe was prejudiced under *Strickland*. We therefore analyze the question ourselves. Prejudice exists "if it is shown that, but for counsel's unprofessional errors, there was a reasonable probability that the petitioner could have negotiated a plea that did not impact immigration status or that he would have litigated an available defense." *Kovacs*, 744 F.3d at 52. Doe has shown both.

12

As a predicate matter, a petitioner alleging ineffective assistance based on immigration misadvice must "clearly demonstrate 'that he placed particular emphasis on [immigration consequences] in deciding whether or not to plead guilty.'" *Id.* (citation omitted).[3] Courts cannot rely solely on "*post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies"; we must also "look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Jae Lee v. United States*, 137 S. Ct. 1958, 1967 (2017). This evidence shows that Doe was deeply concerned about deportation.

---

[3] The Government suggests that it was not an abuse of discretion for the district court to find a lack of prejudice in light of *Jae Lee v. United States*, 137 S. Ct. 1958 (2017), because Doe did not show either that deportation was the "determinative issue" for him or that he "had a large number of discussions with his counsel" about it. The *Jae Lee* Court did note that, in that case, deportation was "determinative" for Lee, based on Lee's "repeated[]" questioning of his attorney and on the testimony of Lee and Lee's attorney at an evidentiary hearing that Lee would have gone to trial if he had known about the risk of deportation. 137 S. Ct. at 1967-68. But *Jae Lee* did not say that a petitioner must show that immigration consequences were his sole concern, or that he had engaged in a "large" number of immigration-related discussions with counsel. (What constitutes a "large" number of discussions the Government does not say, though apparently it is more than the three with which the Government credits Doe.) Rather, the Court asked whether the petitioner "has adequately demonstrated a reasonable probability that he would have rejected the plea had he known that it would lead to mandatory deportation." *Jae Lee*, 137 S. Ct. at 1967. Thus, *Jae Lee* did not alter the standard this court set in *Kovacs*.

While the district court did not hold an evidentiary hearing on the petition, Doe submitted a declaration stating that during an early conversation with his counsel, Doe asked about his immigration situation and his attorney indicated that cooperation and an ultimate plea of guilty should not lead to deportation. Counsel told Doe "that it was not a violent crime, that [Doe] had a green card, and that essentially [Doe] should 'be okay.'" When reviewing the plea agreement that Doe ultimately signed, Doe asked counsel about the listed penalty of deportation—another sign that Doe was particularly concerned about immigration consequences—but counsel "soft-peddled the warning in the agreement as a possible penalty that was put in all agreements for people who were not citizens." The Government credited Doe's statements below and does not challenge them on appeal.

Doe's defense counsel also said in an earlier statement that he and Doe were assured by the Government that they would do everything they could to keep Doe in the United States, that the Government was aware of the extreme danger Doe would face if he were sent back to his home country, and that counsel and Doe relied on the representations the Government gave them at the

14

time of Doe's plea. These statements buttress Doe's claim that he would not have pleaded guilty had he known about the deportation consequences of doing so.

Evidence regarding Doe's background likewise backs up Doe's later assertions that he was focused on remaining in the country. His history in the United States, his family circumstances, and his gainful employment all signal Doe's strong connection to, and desire to remain in, the United States. *See Jae Lee*, 137 S. Ct. at 1968 (finding it relevant that "Lee had lived in the United States for nearly three decades, had established two businesses in Tennessee, and was the only family member in the United States who could care for his elderly parents," and that "there is no indication that he had any ties to South Korea [as] he had never returned there since leaving as a child"). The Government "has given no persuasive reason to conclude that the likely grave immigration consequences of his plea were not of great importance" to Doe. *United States v. Gonzales*, 884 F.3d 457, 461 (2d Cir. 2018) (per curiam).

While not contemporaneously documented, Doe's statements regarding what occurred at his plea hearing add to his claim. The Government attempts to use the plea hearing against Doe: it points to Doe's statements during the plea

15

hearing to argue that he pleaded guilty after being warned of the immigration consequences of his plea. The district court stated that Doe "was instructed that his entry of a plea of guilty could result in his deportation given that the value of ████████ exceeded $10,000 and therefore constituted an aggravated felony." The latter part of this statement was clear error. The magistrate judge did ask Doe, as part of a standard plea colloquy, if he understood that he "may be deported as a result of this conviction." Yet nowhere during the colloquy did the court inform Doe that the crime to which he was pleading guilty constituted an aggravated felony, or what the mandatory consequences of pleading to an aggravated felony would be. And Doe indicated in a declaration that his attorney misadvised him further in response to the judge's question, emphasizing that the judge said "may be" rather than "would be." The Government does not challenge Doe's characterization of what occurred during the plea hearing.[4]

Given the evidence that Doe was quite concerned about remaining in the country, it is clear that he would have preferred to negotiate a plea that did not

---

[4] The Government notes that there is no record that Doe's counsel actually stopped the proceedings, as counsel did in *Jae Lee*. But *Jae Lee* did not state that actual stoppage is required in order to show prejudice. 137 S. Ct. at 1968 & n.4.

trigger mandatory removal. Likewise, there is "a reasonable probability that the prosecution would have accepted, and the court would have approved, a deal that had no adverse effect on [his] immigration status." *Kovacs*, 744 F.3d at 52. The Government cited this language in *Kovacs* in explaining to the district court why it believed Doe's counsel's mistaken advice had prejudiced Doe. Therefore, in joining Doe's motion, the Government implicitly admitted that a plea might have been negotiated without mandatory immigration consequences. There is also a reasonable probability that the court would have accepted a plea to a lesser charge, since the court ultimately sentenced Doe to probation rather than prison.

The entirety of the Government's argument to the contrary on appeal is that Doe does not cite any alternative charge that could have been brought. But it was not necessary to bring a different charge. Doe pleaded to one count of conspiracy ███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

17

███████████████████████████ It was eminently possible to keep the loss amount between ████ and $10,000 by charging Doe for a conspiracy that only encompassed a few of his documented transactions.

Moreover, while Doe did not point to another charge that could have formed the basis of a plea, one clearly existed: ██████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ There is a reasonable probability that, had all parties been aware of the possibility of mandatory deportation, the Government would have been willing to charge Doe with ████ based on one or more specific transactions with a total loss amount under $10,000—rather than the higher loss and restitution amounts actually charged—in exchange for the cooperation that Doe promised in his plea deal. Given Doe's promised cooperation, as well as the Government's assurances during plea negotiations that it would do everything it could to prevent Doe's removal, there is a reasonable probability that the Government would have accepted charging a lower loss amount.

There is also a reasonable probability that, had Doe known of the mandatory removal provision, Doe would have litigated an available defense. Doe asserts that he could have (and would have) tried the case or challenged the loss figure had he known that a plea would lead to deportation. The Government responds that the evidence against Doe was too "overwhelming" to go to trial, and that Doe would have had no way to successfully challenge the loss amount. But this is not entirely certain. There were ways for Doe to challenge both the charges themselves and the loss amount. Doe provided some of the evidence against himself during his proffer sessions, which Doe claims he would not have undertaken had his attorney told him about the possibility of mandatory deportation. Doe also might have contested intent, as he believed he had a good argument that he did not know the purpose of the ██████████████ and was just ████████████████████████████████████████.

To contest the loss amount, Doe could have challenged the extent of his involvement in the scheme and argued that he should be held liable only for the losses he himself caused. *See United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995) (holding that "the fact that the defendant is aware of the scope of the

19

overall operation is not enough to hold him accountable for the activities of the whole operation," and that the key question is "what role the defendant agreed to play in the operation"). There was no indication in the complaint that Doe had "suggested" the crimes that caused the loss. *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir. 1998). Therefore, Doe could have argued that "[h]e followed instructions on ███████████ potential customers but did not design or develop the scam." *Id.* He might then have only been held responsible for the transactions he himself made—and Doe had a possible basis to argue that these transactions totaled less than $10,000. The criminal complaint stated that Doe and ████████████████████████████ and that together they caused well over $100,000 in losses; it did not state how much of the money went to Doe rather than ███████████—information that could weigh on the nature or extent of any conspiracy. Doe also claimed that a second person ██████████████ ████████████████████████████████████████████ ██████████████████████████████████████ Thus, there was a path available to Doe—albeit a narrow one—to challenge either the

20

charges against him or the loss amount had he not cooperated under a mistaken impression that he would be safe from removal.

Moreover, the Supreme Court has clarified that "there is more to consider than simply the likelihood of success at trial"; the inquiry focuses on the defendant's decision-making process, and "[t]he decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea." *Jae Lee*, 137 S. Ct. at 1966. Here, even if Doe were likely to lose, it would be far from irrational for Doe to litigate either the entire charge or the loss amount, given his strong interest in remaining in the country. If Doe had fought the charge in the information and lost, he would have had a Guidelines level of █, exposing him to ████████████████████. His plea agreement left him at a Guidelines level of █, for a ███████████ Guidelines sentence. This difference in risk is slight enough to pursue even a small possibility of an acquittal or a successful challenge of the loss figure. *See id.* at 1966-67. As Doe can show that he had a reasonable probability either of negotiating a different plea or of going to trial or litigating the loss amount, he has proven that his counsel's immigration misadvice was prejudicial. *See Kovacs*, 744 F.3d at 53 ("[T]he question is not

21

whether the defense would ultimately have been successful. Rather, the inquiry is whether the defense was viable and sufficiently promising that [petitioner] would have litigated the defense to avoid immigration consequences.").

## B.    Sound Reasons for Delay

To receive *coram nobis* relief, Doe must also show that he provided sound reasons for his delay in seeking to vacate his conviction. The district court did not determine whether Doe had justified his delay. However, we must do so to resolve Doe's claim. *See Kovacs*, 744 F.3d at 54. While "[n]o statute of limitations governs the filing of a *coram nobis* petition," *id.*, a petitioner must still show "sound reasons" for the delay in bringing the petition, *Foont*, 93 F.3d at 79. To decide whether sound reasons exist, the court must focus on "the circumstances surrounding the petitioner's failure to raise the issue earlier rather than the government's injury that resulted from the delay." *Id.* at 80. "The critical inquiry . . . is whether the petitioner is able to show justifiable reasons for the delay." *Id.*

Doe has provided sufficient reasons to justify his delay. He claims that his handlers promised him that he would obtain citizenship or that they would get his criminal case dismissed. The Government does not contest Doe's contentions

that his handlers dissuaded him from seeking to vacate his conviction. Instead, it asserts that the timeline after Doe was denied citizenship in █████ is somewhat vague, such that a court could plausibly conclude that he had not sufficiently explained why he waited five more years before filing his petition. However, as noted above, the district court did not actually decide the issue. Abuse-of-discretion review, therefore, is inappropriate here.

In any case, Doe's declarations provide sufficient justification for his delay. He states, and the Government does not dispute, that agents continued to tell him after his failed citizenship application that they would be able to provide him the relief he sought. Doe's recollection of a █████ statement that his file was "a 7 out of 10" and that he should "just hold on and it would be 10 out of 10" and he would get the relief he wanted, further explains why Doe continued to rely on his handlers rather than a *coram nobis* petition to address his immigration problem.

Nor is the timeline as vague as the Government suggests. Doe clearly states that he decided to pursue a petition directly prior to hiring counsel in █████, once he finally realized that his handlers could not, in fact, gain him citizenship.

23

He then moved with diligence, pausing only to procure the original criminal complaint. These facts clearly differentiate this case from those the Government cites, in which petitioners provided either patently insufficient justifications or no justifications at all. *See, e.g.*, *United States v. Sash*, 374 F. App'x 198, 200 (2d Cir. 2010) (summary order); *Jae Hyun Ahn v. United States*, 96 F. App'x 43, 44 (2d Cir. 2004) (summary order); *Rodriguez v. United States*, No. 98 Cr. 00764 MHD, 2012 WL 6082477, at *10 (S.D.N.Y. Dec. 4, 2012). Nor does "the Government . . . suggest any tactical reason [Doe] would have delayed pursuit of the writ" absent continued discouragement from his handlers, *Kovacs*, 744 F.3d at 54—particularly since the Government does not contest that Doe repeatedly discussed his desire to vacate his conviction with the agents. We therefore conclude that Doe's petition was timely.

## III.   Vacatur of the Plea and Transfer

Having concluded that Doe has met his burden to receive *coram nobis* relief, we must determine the scope of that relief. The plea for relief in Doe's petition asks only to vacate his conviction. However, both the petition itself and the Government's letter supporting the petition clearly contemplate vacatur of

Doe's guilty plea, as well. Both parties stated at oral argument that if we were to grant Doe's petition, we should also vacate Doe's plea. We agree. We therefore direct the district court to grant Doe's *coram nobis* petition and vacate both his conviction and his plea.

Finally, because the district court denied Doe's *coram nobis* petition, it did not rule on the Government's request to transfer Doe's criminal case to the ████████████████████. However, both parties consented to this transfer below and agree that such a transfer is the preferred outcome if the district court's judgment is reversed. Given that "the convenience of the parties, . . . in the interest of justice," clearly favors transfer, Fed. R. Crim. P. 21(b), and that the parties have given their consent, we hereby direct the district court to transfer Doe's underlying criminal case to the ███████████████████ for further proceedings.

## CONCLUSION

As we reflect on the Government's troubling changing positions in this matter—after having once rightly concluded that Doe is entitled to relief—we are reminded of then-Attorney General Robert F. Kennedy's cautioning words: "It is,

after all, not the Department of Prosecution but the Department of Justice . . . . [T]he interest of the Government . . . is not that it shall win a case, but that justice shall be done."[5] For the foregoing reasons, the judgment below is **REVERSED**, and the case is **REMANDED** to the district court with instructions to grant the writ, vacate Doe's plea and conviction, and transfer Doe's criminal case to the ███████████████████ .

---

[5] Robert F. Kennedy, Att'y Gen., Address to the National Conference on Bail and Criminal Justice 2 (May 29, 1964) (available in the John F. Kennedy Library).