FILED
United States Court of Appeals
Tenth Circuit

March 17, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CESAR AGUAYO-MONTES,

    Defendant - Appellant.

No. 24-4073

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 4:23-CV-00045-DN and 4:21-CR-00069-DN-1)**

_____

Benjamin C. McMurray, Assistant Federal Public Defender (Scott Keith Wilson, Federal Public Defender, with him on the briefs), Salt Lake City, Utah, for Defendant-Appellant.

Briggs J. Matheson, Assistant United States Attorney (Felice John Viti, Acting United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **KELLY** and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

Before Cesar Aguayo-Montes (Aguayo) pleaded guilty to a drug charge, he asked his attorney about the impact it would have on his immigration status. Aguayo had lived in Colorado for as long as he could remember, so he was concerned about a line in the plea agreement warning that he "may" be removed. Counsel said he

couldn't tell Aguayo what would happen but that Aguayo didn't need to worry about it until he got to prison. Acting on that advice, Aguayo agreed to plead guilty to possessing heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1), a controlled-substance offense that made his deportation practically inevitable.

After learning that his plea had all but sealed his immigration fate, Aguayo filed a 28 U.S.C. § 2255 motion to vacate his conviction. He alleged that his Sixth Amendment right to effective assistance of counsel was violated because his attorney's advice on the immigration consequences of his plea fell below the standard set in *Padilla v. Kentucky*, 559 U.S. 356 (2010). The district court denied the motion, explaining that Aguayo couldn't succeed on his challenge because he knew all he was entitled to know—that his plea exposed him to a risk of deportation. Aguayo appeals the district court's denial of his habeas motion.

We conclude that *Padilla* compels a different result. When the immigration consequences of a conviction are "truly clear," as they were here, "the duty to give correct advice is equally clear." *Id.* at 369. As such, Aguayo's counsel should have advised him that his deportation would be "automatic," "presumptively mandatory," or "practically inevitable." *Id.* at 360, 363–64, 368–69. On the facts we have before us, he did not do so. We thus reverse and remand for further proceedings.

### Background

Aguayo's parents brought him to the United States when he was two years old, and he has lived in Colorado ever since. At age 16, he received immigration relief under the Deferred Action for Childhood Arrivals program, which grants renewable

two-year reprieves from deportation to noncitizens who entered without authorization as children. Aguayo went on to graduate high school with honors and attend college, but he dropped out after his parents divorced. He worked at a municipal parks department for five years and then, after failing a drug test, joined his dad's landscaping company, which he hoped to take over some day. At the time of his arrest, he owned a home in the Denver area and was in a relationship with Angelica Alonso Rodriguez (Alonso).

In June 2021, Aguayo and Alonso drove through Washington City, Utah. A police officer saw their car abruptly exit the highway and pull into a gas station. The officer watched as Alonso got out, wearing a backpack, and Aguayo drove off. The officer stopped the car, asked Aguayo some questions, and then walked a K9 drug dog around the car. The K9 alerted to the presence of drugs. Meanwhile, another officer stopped Alonso. She admitted that the backpack she was carrying contained drugs and that cartel members had instructed her to abandon it or they would kill her and her family. After obtaining a warrant, the officers searched the backpack and found 16 pounds of heroin.

In July 2021, the government charged Aguayo with one felony count of possession with intent to distribute under § 841(a)(1). Aguayo met with retained counsel and, according to his § 2255 motion,[1] immediately told his attorney "that he

---

[1] Like the district court did, we accept the facts alleged in the § 2255 motion for purposes of this appeal. Postconviction counsel explained that he was unable to attach a sworn declaration to Aguayo's § 2255 motion because he was representing Aguayo from a distance. Instead, postconviction counsel "signed a declaration

was worried about being deported and that his most important concern was to remain in the United States." R. vol. 1, 7. Aguayo's § 2255 motion additionally stated that counsel advised him to "waiv[e] his right to a detention hearing and participat[e] in a debrief with law[-]enforcement officers" in exchange for "a more favorable plea offer." *Id.*

Months passed before the parties finally negotiated a plea deal, and counsel visited Aguayo to advise him of the deal's terms: Aguayo would plead guilty to violating § 841(a)(1) in exchange for an agreed-upon sentence. *See* Fed. R. Crim. P. 11(c)(1)(C). Aguayo immediately noticed the immigration provision in the agreement. The provision read: "I understand that, if I am not a United States citizen, I may be removed from the United States, denied citizenship, and denied admission to the United States in the future." R. vol. 1, 153. Aguayo asked what it meant and told counsel again that he didn't want to be deported. Counsel said "he was not an immigration attorney and could not tell him what would happen," but Aguayo "didn't need to worry about that until he got to prison[,] and . . . once he was in prison, he could contact an immigration lawyer." *Id.* at 9.

Counsel never advised Aguayo that a § 841(a)(1) conviction would be classified as a deportable controlled-substance offense. *See* 8 U.S.C. § 1227(a)(2)(B)(i). Nor did counsel warn Aguayo that pleading guilty "would result

_____

indicating that the statements in the" motion were "statements that [Aguayo] ha[d] made to [him], and that [Aguayo] assert[ed] . . . [we]re, in fact, true statements." R. vol. 3, 9.

in his automatic deportation." R. vol. 1, 9. According to his motion, if Aguayo had understood that, he would've rejected the plea deal.

Yet in February 2022, Aguayo pleaded guilty to possession with intent to distribute under § 841(a)(1). The district judge conducted a colloquy under Federal Rule of Criminal Procedure 11, during which it confirmed that "pleading guilty could [a]ffect [Aguayo's] ability to remain in or return to the United States." R. vol. 1, 37; *see also* Fed. R. Crim. P. 11(b)(1)(O). After accepting Aguayo's plea, the district court sentenced Aguayo to 37 months in prison.

Aguayo timely moved to vacate his conviction under § 2255. He raised a due-process violation and alleged ineffective assistance of counsel, arguing that his attorney prejudicially failed to advise him of his conviction's immigration consequences as required by *Padilla*. Accepting the allegations in Aguayo's motion, the district court ruled that both claims failed. Aguayo's due-process claim came up short, it explained, because he had not shown that his plea was unknowing or involuntary. And his ineffective-assistance claim collapsed because, in the district court's view, Aguayo's attorney didn't violate *Padilla*'s duty to advise. The district court did not reach the "intensely factual" inquiry into whether any deficient advice caused prejudice, which it acknowledged would be largely "dependent [in] this instance on [Aguayo's] testimony" and his deceased trial counsel's files. R. vol. 3, 19. It did, however, grant a certificate of appealability.

Aguayo appeals.

5

**Analysis**

Aguayo contends the district court incorrectly rejected his Sixth Amendment challenge to his counsel's immigration advice.[2] In a § 2255 appeal like this one, we generally "review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Barrett*, 797 F.3d 1207, 1213 (10th Cir. 2015) (quoting *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011)). "Where, as here, the district court d[id] not hold an evidentiary hearing, but rather denie[d] the motion as a matter of law upon an uncontested trial record, our review is strictly de novo." *Id.* (cleaned up) (quoting *Rushin*, 642 F.3d at 1302).

The Sixth Amendment guarantees effective assistance of counsel at all "critical stages of [a defendant's] criminal proceedings." *Missouri v. Frye*, 566 U.S. 134, 140 (2012) (cleaned up) (quoting *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)). In a criminal system that "is for the most part a system of pleas, not a system of trials," plea bargaining is one such critical stage. *Id.* at 143–44 (quoting *Lafler v. Cooper*, 566 U.S. 156, 170 (2012)).

If that guarantee is breached, a defendant may challenge his plea under the familiar "two-part *Strickland* . . . test." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see also Strickland v. Washington*, 466 U.S. 668 (1984). This test requires defendants to show: "(1) defense counsel's performance was deficient, . . . and (2) [the] defendant was prejudiced thereby." *Rushin*, 642 F.3d at 1302. Aguayo maintains he passed that

---

[2] Aguayo does not separately challenge the district court's ruling that his plea was knowing and voluntary.

test. He says his attorney both undersold and affirmatively misled him about the immigration consequences of his conviction, which led him to accept a plea deal he otherwise would have rejected. We consider each prong in turn.

## I.     Deficient Performance

Effective representation at the plea-negotiation stage includes advising a defendant of a conviction's attendant immigration consequences. *See Padilla*, 559 U.S. at 374. So we must decide whether counsel's advice violated *Padilla*'s charge to correctly inform Aguayo of the risk of deportation. We hold that it did, twice over.

### A.     Equivocal Advice

We begin with Aguayo's theory that counsel's advice was deficient because it was too equivocal. He says counsel needed to inform him that pleading guilty would make his deportation "automatic[]," not a mere possibility. Aplt. Br. 7 (cleaned up). The government disagrees, arguing counsel discharged his duty by alerting Aguayo to a "risk" of deportation. Aplee. Br. 9 (cleaned up). Like our sibling circuits, we resolve this dispute by returning to *Padilla*. *See, e.g.*, *United States v. Ramirez-Jimenez*, 907 F.3d 1091 (8th Cir. 2018); *United States v. Rodriguez-Vega*, 797 F.3d 781 (9th Cir. 2015).

*Padilla* announced "that [defense] counsel must inform her client whether his plea carries a risk of deportation." 559 U.S. at 374. The Court recognized that avoiding deportation—a severe consequence equivalent to "banishment or exile"—is of the utmost importance to noncitizens facing criminal charges. *Id.* at 373 (quoting

7

*Delgadillo v. Carmichael*, 332 U.S. 388, 390–91 (1947)). Indeed, the twin goals of preserving a defendant's "'right to remain in the United States'" and "'the possibility of' discretionary relief from deportation" may be "'more important to the [defendant] than any potential jail sentence.'" *Id.* at 368 (quoting *INS v. St. Cyr*, 533 U.S. 289, 322–23 (2001)). To vindicate those interests, counsel must correctly assess immigration consequences at the outset, when she "may be able to plea[-]bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce the likelihood of deportation." *Id.* at 373.

Unfortunately, immigration law is a "complex . . . legal specialty of its own"— one that not all defense lawyers are "well versed in." *Id.* at 369. Short of developing expertise in immigration, defense lawyers could easily find themselves tripped up by murky areas of the law. *See id.* at 377–78 (Alito, J., concurring) (noting complexity associated with certain categories of immigration-adverse offenses, "such as crimes involving moral turpitude" (cleaned up) (quoting M. Garcia & L. Eig, CRS Report for Congress, Immigration Consequences of Criminal Activity (Sept. 20, 2006))).

Anticipating this issue, the Court pegged the quantum of required advice to the clarity of the relevant immigration law. That is, if "the deportation consequences of a particular plea are *unclear or uncertain*[,] . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges *may* carry a *risk* of adverse immigration consequences." *Id.* at 369 (emphases added). "But when the deportation consequence is truly *clear*, . . . the duty to give *correct advice* is equally clear." *Id.* (emphases added).

The state drug-trafficking conviction at issue in *Padilla* fell into the "truly clear" category. *Id.* Like almost every drug crime—state or federal—it qualified as a deportable controlled-substance offense under 8 U.S.C. § 1227(a)(2)(B)(i). *See id.* at 359 n.1. That much was obvious just "from reading the removal statute." *Id.* at 369. And the immigration consequences for pleading guilty to a controlled-substance offense are severe: "deportation [i]s presumptively mandatory" and "practically inevitable." *Id.* at 364, 369. As such, "constitutionally competent counsel would have advised [her client] that his conviction for drug distribution made him subject to *automatic deportation*." *Id.* at 360 (emphasis added).

As Aguayo asserts, his case falls squarely within *Padilla*'s ambit. His federal heroin conviction—like the state drug charge at issue in *Padilla*—is a deportable controlled-substance offense. *See* § 1227(a)(2)(B)(i) (defining controlled-substance offense to include any "violation of . . . any law or regulation of . . . the United States . . . relating to a controlled substance []as defined in [21 U.S.C. § ]802"); 21 U.S.C. § 802(6) (defining "controlled substance" to include "a drug . . . included in schedule I"); *id.* § 812 (classifying heroin as schedule I drug). So we needn't look further than *Padilla* to determine the clarity of the immigration consequences attached to Aguayo's § 841(a)(1) conviction. Like the state drug charge at issue there, a violation of § 841(a)(1) carries "truly clear" immigration consequences, so Aguayo was entitled to receive immigration advice tailored to his plea. *Padilla*, 559 U.S. at 369. He was entitled to know that deportable offenses trigger

"presumptively mandatory" immigration consequences and that pleading guilty would make him "subject to automatic deportation." *Id.* at 360, 369.

Yet the most definitive advice Aguayo received about § 841(a)(1) came from the plea agreement's standard warning that "if [he is] not a United States citizen, [he] *may* be removed from the United States, denied citizenship, and denied admission to the United States in the future." R. vol. 1, 153 (emphasis added); *see also* Fed. R. Crim. P. 11(b)(1)(O) (directing courts to give same advisement during plea colloquies). Counsel did not communicate that Aguayo would be "subject to *automatic* deportation." *Padilla*, 559 U.S. at 360 (emphasis added). At best, he put Aguayo on notice that he faced a risk of removal. That violated Aguayo's right to clear advice—and by extension, effective counsel.

The government disagrees, reading *Padilla* to demand no more than Aguayo received: notice of possible removal. And to be sure, *Padilla*'s topline holding is phrased in generic terms. It requires counsel to "inform her client whether his plea carries a *risk* of deportation," *id.* at 374 (emphasis added), a mandate that on its face could be satisfied by telling a client he "may" be deported, R. vol. 1, 153. In the government's view, that's what the Court meant when it held counsel should have advised her client that he was "*subject to* automatic deportation." *Id.* at 360 (emphasis added). "Subject to" translates roughly to "prone [to]" or "disposed [to]," the government explains, and thus conveys mere possibility. Aplee. Br. 12. From that perspective, telling a client he is "subject to automatic deportation" equates to

10

advising of a "risk" of removal, *Padilla*, 559 U.S. at 360, 374, so a defendant facing a deportable charge need only be advised that he "may" be deported, R. vol. 1, 153.

But the government's approach would obliterate the distinction *Padilla* drew between "clear" and "unclear" immigration consequences. 559 U.S. at 369. The advice clients would receive about offenses that "automatically trigger[] the removal consequence" (i.e., there is a "risk" of deportation) would not be meaningfully different from the advice they'd receive about much more minor offenses (i.e., there is "a risk of adverse immigration consequences"). *Id.* at 369, 373–74. In effect, counsel could treat every immigration outcome as "uncertain." *Id.* at 369. And that would fly in the face of *Padilla*'s lesson that "when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear."[3] *Id.*

Undeterred, the government invokes *Chaidez v. United States*, which characterized *Padilla* as requiring only "advice about the *risk* of deportation arising from a guilty plea." 568 U.S. 342, 344 (2013) (emphasis added). But advising a client "about" a risk means more than just noting its existence. At the very least, competent advice "about" risk includes both "recogni[zing] that a risk exists" and offering "a qualitative assessment of that risk." Rep. Br. 19. That is particularly true when the

---

[3] Other courts have discussed *Padilla* uncertainty in similar terms. In *Diaz v. State*, for example, the Iowa Supreme Court explained that "the 'clear' and 'unclear' dichotomy in *Padilla* relates only to whether the crime charged is a crime covered under the immigration statute." 896 N.W.2d 723, 730 (Iowa 2017); *see also Martin v. United States*, 949 F.3d 662, 668–69 (11th Cir. 2020) (describing consequences as uncertain because it was unclear how conviction would be classified under immigration law).

immigration impact of an offense is "clear"; in such cases, *Padilla* promises more—"equally clear" and "correct" advice. 559 U.S. at 369. The government attempts to sidestep that standard's application here by highlighting that the Court "did not specify [all] situations in which a removal consequence is 'truly clear.'" Aplee. Br. 11 (quoting *United States v. Roman*, No. 15-cv-01173, 2015 WL 12857313, at *7 (D. Colo. Aug. 27, 2015) (unpublished)). Maybe so. But the Court inarguably did so for at least one class of crimes: deportable controlled-substance offenses like Aguayo's. *See Padilla*, 559 U.S. at 368–69.

The government thus pivots to a semantic strawman—likening Aguayo's preferred rule to advising that deportable convictions "will absolutely result in deportation." Aplee. Br. 13 (quoting *State v. Shata*, 868 N.W.2d 93, 109 (Wis. 2015)). Of course, Aguayo isn't seeking to excise all nuance from counsel's immigration advice. If he were, we'd agree he'd gone too far. The immigration consequences of some offenses can be difficult to determine. *See, e.g.*, *Padilla*, 559 U.S. at 378 (Alito, J., concurring) (highlighting difficulty of determining which offenses are "crimes involving moral turpitude"); *see also id.* at 368–69 (majority opinion) (acknowledging complexity of immigration law). And even when the law plainly attaches deportation consequences to an offense, some noncitizens may find legal ways to remain in the United States. *See, e.g.*, 8 C.F.R. § 1208.16(c) (permitting protection under the Convention Against Torture regardless of criminal history). These inherent uncertainties in immigration enforcement and relief mean counsel can't *guarantee* a conviction will result in deportation. *See United States v. Urias-*

*Marrufo*, 744 F.3d 361, 370 (5th Cir. 2014) (Garza, J., concurring) (questioning whether *Padilla* requires counsel to warn of "certain" deportation). But that doesn't excuse counsel from providing his client clear advice regarding deportation consequences when immigration law is clear about those consequences. In this case, counsel undisputedly had an obligation to advise Aguayo that, under "the removal statute, his deportation was presumptively mandatory"—or words to that effect. *Padilla*, 559 U.S. at 369.

What's more, the balance of authority is not on the government's side. The three unpublished Tenth Circuit decisions the government cites do not consider, let alone decide, Aguayo's theory of deficient performance. *See United States v. Carillo-Estrada*, 564 F. App'x 385, 387 (10th Cir. 2014) (deciding due-process, not ineffective-assistance-of-counsel, challenge and noting that "[w]e have not extended *Padilla* to the due-process context"); *United States v. Nunez*, 489 F. App'x 295, 296 (10th Cir. 2013) (denying certificate of appealability with minimal explanation because record didn't support claim that counsel failed to advise); *United States v. Gomez-Alvarez*, 482 F. App'x 330, 335–36 (10th Cir. 2012) (dismissing appeal under *Anders v. California*, 386 U.S. 738 (1967), where record showed defendant received immigration advice). And the government identifies only one published out-of-circuit decision rejecting a purportedly similar challenge, *Ramirez-Jimenez*, 907 F.3d 1091. There, the Eighth Circuit held that counsel fulfilled his *Padilla* duty by advising the defendant he would "likely" be deported, reasoning that the defendant was entitled to know only that "his conviction would make him 'deportable[,]' . . . not that

13

deportation or removal was either mandatory or certain." *Id.* at 1092, 1094. Although the defendant in *Ramirez-Jimenez* framed his argument similarly to Aguayo's, the underlying facts are distinguishable—there, the defendant's counsel informed him that deportation was "likely," which is qualitative information *about* the risk of deportation that Aguayo lacked. So it's not clear to us that the Eighth Circuit would come down the same way on the facts alleged here. But if so, it would be an outlier.

Many courts have emphasized counsel's duty to accurately convey the risk of deportation, often in the context of "aggravated felony" convictions that trigger "virtual[ly] certain[]" removal.[4] *Sessions v. Dimaya*, 584 U.S. 148, 153 (2018). In one example, the Ninth Circuit deemed a lawyer's representation "constitutionally ineffective" because he advised that an aggravated-felony plea carried "the mere 'potential' of removal." *Rodriguez-Vega*, 797 F.3d at 788. In another, the Fourth Circuit found deficient performance after an attorney advised that pleading to an offense she mistakenly believed was not an aggravated felony "presented only a risk"

---

[4] Like a controlled-substance offense, an "aggravated felony" makes a noncitizen "deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). But its effects don't stop there. Aggravated felonies also preclude all but the rarest forms of immigration relief. *See* 8 U.S.C. § 1158(b)(2)(A)(ii), (B)(i) (making noncitizen convicted of aggravated felony ineligible for asylum); *id.* § 1182(a)(9)(A)(i), (ii) (making noncitizen convicted of aggravated felony subject to permanent exclusion); *id.* § 1229b(a)(3), (b)(1)(C), (b)(2)(A)(iv) (making noncitizen convicted of aggravated felony ineligible for cancellation of removal); *id.* § 1229c (making noncitizen convicted of aggravated felony ineligible for voluntary departure). *But see id.* § 1231(b)(3)(A), (B) (permitting withholding of removal to noncitizens with certain aggravated felonies); 8 C.F.R. § 1208.16(c) (permitting protection under Convention Against Torture regardless of criminal history).

of deportation. *United States v. Swaby*, 855 F.3d 233, 240 (4th Cir. 2017).[5] The

Second Circuit, too, admonished counsel for "inaccurately convey[ing] that

[a defendant's] plea of guilty to [an aggravated-felony] charge would not make his

deportation mandatory."[6] *Doe v. United States*, 915 F.3d 905, 911 (2d Cir. 2019).

And the Third, Fifth, and Eleventh Circuits, as well as several state courts, have

shown openness to ineffectiveness challenges based on equivocal advice in the face

of unequivocal consequences.[7]

---

[5] The government attempts to distinguish *Rodriguez-Vega* and *Swaby* as limited to situations "where counsel provided 'false assurance' that the defendant was pleading guilty to an offense that might not subject him to automatic deportation." Aplee. Br. 19 (quoting *Padilla*, 559 U.S. at 368). The Fourth and Ninth Circuits did not so cabin their holdings, however. *See Rodriguez-Vega*, 797 F.3d at 786 ("[W]here the law is 'succinct, clear, and explicit' that the conviction renders removal virtually certain, counsel must advise his client that removal is a virtual certainty." (quoting *Padilla*, 559 U.S. at 368)); *Swaby*, 855 F.3d at 240 ("Effective representation by counsel requires that counsel provide correct advice when the deportation consequences are clear."). To do so would insulate overly generic advice from Sixth Amendment challenges, effectively reinstating the requirement that defendants show "affirmative misadvice." *Padilla*, 559 U.S. at 369. And *Padilla* squarely rejected that limitation. *See id.* at 369–74.

[6] Aguayo's conviction also plainly qualifies as an "aggravated felony." 8 U.S.C. § 1101(a)(43)(b) (defining "aggravated felony" to include any "drug[-]trafficking crime []as defined in [18 U.S.C. § ]924(c)"); *see also* 18 U.S.C. § 924(c) (defining "drug[-]trafficking crime" to include "any felony punishable under the Controlled Substances Act (21 U.S.C. [§ ]801 et seq.)"); 21 U.S.C. § 812 (classifying heroin as schedule I drug); *id.* § 841(a)(1), (b)(1)(A) (punishing possession with intent to distribute schedule I drug as felony). As such, Aguayo urges us to hold that counsel needed to advise him that removal was a "virtual certainty." *Rodriguez-Vega*, 797 F.3d at 788. But we need not reach that precise question to determine that counsel's advice was too equivocal under *Padilla*, so we decline to do so.

[7] *See United States v. Fazio*, 795 F.3d 421, 427–28 (3d Cir. 2015) (observing that "counsel did not inform [defendant] that [his aggravated-felony plea] made him subject to automatic deportation, as is required under *Padilla*" but resolving appeal on prejudice); *United States v. Armendariz*, 80 F.4th 546, 552–53 (5th Cir. 2023)

15

(explaining that counsel had satisfied *Padilla* duty by putting client "on notice that she faced the 'very likely' risk of deportation," rather than giving "weak or middling advice [of] 'possible immigration consequences'"); *Hernandez v. United States*, 778 F.3d 1230, 1233 (11th Cir. 2015) (concluding that defendant sufficiently alleged deficient performance based on advice "that there was a 'substantial likelihood that he would not be deported'" after drug-trafficking conviction (cleaned up) (quoting *Padilla*, 559 U.S. at 369)); *Barrie v. United States*, 279 A.3d 858, 864–65 (D.C. 2022) (agreeing with "a number of courts" finding "constitutionally deficient assistance of counsel where trial counsel failed to advise a defendant that deportation was a presumptively mandatory consequence of conviction of a particular offense"); *Diaz*, 896 N.W.2d at 732 (requiring counsel to explain "the specific statutory [immigration] consequences . . . with reasonable clarity"); *Araiza v. State*, 481 P.3d 14, 27 (Haw. 2021) (holding "that defense attorneys must advise their clients using language that conveys that deportation 'will be required' by applicable immigration law for an aggravated[-]felony conviction"); *Budziszewski v. Comm'r of Corr.*, 142 A.3d 243, 249 (Conn. 2016) (holding that "[w]arning of only a 'heightened risk' of deportation" was insufficient and "counsel was required to unequivocally convey to the petitioner that federal law mandated deportation" for drug-trafficking plea); *Encarnacion v. State*, 763 S.E.2d 463, 466 (Ga. 2014) ("It is not enough to say 'maybe' when the correct advice is 'almost certainly will.'"); *Commonwealth v. DeJesus*, 9 N.E.3d 789, 796 (Mass. 2014) (finding advice deficient because it did "not convey . . . that all of the conditions necessary for removal would be met by the defendant's guilty plea, and that, under [f]ederal law, there would be virtually no avenue for discretionary relief"); *Hernandez v. State*, 124 So. 3d 757, 762 (Fla. 2012) (finding counsel's performance "deficient under *Padilla*" because counsel "fail[ed] to advise [defendant] that his plea subjected him to presumptively mandatory deportation"); *State v. Sandoval*, 249 P.3d 1015, 1020 (Wash. 2011) (holding deficient counsel's advice that client "would not be immediately deported and . . . would then have sufficient time to retain proper immigration counsel to ameliorate any potential immigration consequences of his guilty plea" because it "impermissibly left . . . the impression that deportation was a remote possibility"); *cf. People v. Patterson*, 391 P.3d 1169, 1176–77 (Cal. 2017) (distinguishing between advice addressing "actual risk" that conviction will lead to deportation and "general awareness that a criminal conviction 'may' have adverse immigration consequences"). *But see State v. Sanmartin Prado*, 141 A.3d 99, 127 (Md. 2016) (holding that "nothing . . . in *Padilla* requires defense counsel to inform noncitizens that a conviction for a deportable offense will absolutely or with certainty result in the . . . government . . . initiating deportation proceedings"); *Shata*, 868 N.W.2d at 109–10 (same).

16

Like these courts, we conclude that when the immigration consequences of an offense are clear, as they are here, defense counsel must provide an equally clear assessment of the risks. At a minimum, counsel should've advised Aguayo that a § 841(a)(1) conviction would subject him to "automatic," "presumptively mandatory," or "practically inevitable" deportation. *Padilla*, 559 U.S. at 360, 363–64, 368–69. Advising Aguayo that his conviction "may" trigger his removal, however technically accurate, was insufficient. R. vol. 1, 153. "Warning of the possibility of a dire consequence is no substitute for warning of its [practical inevitability]." *Rodriguez-Vega*, 797 F.3d at 790. As another court put it, "I know every time that I get on an airplane that it could crash, but if you tell me it's going to crash, I'm not getting on." *Id.* (quoting Transcript at 52, *United States v. Choi*, No. 08-CV-00386 (N.D. Fla. Sept. 30, 2008), Dkt. No. 96). Aguayo was entitled to make an equally informed choice about his plea.

### B.     Affirmative Misadvice

We turn next to Aguayo's theory that counsel affirmatively misadvised him. Courts have long recognized that "affirmative misadvice" about the immigration consequences of a plea qualifies as deficient performance. *See Padilla*, 559 U.S. at 369–74. In *Padilla* itself, members of the Court described counsel's advice as inadequate not just because it failed to communicate the risk of deportation, but also because it was actively "mislead[ing]." *Id.* at 375 (Alito, J., concurring in the judgment); *see also id.* at 369 (majority opinion).

17

Aguayo alleges that when he asked how his plea would impact his immigration status, counsel said "he was not an immigration attorney" and "could not tell [Aguayo] what would happen," but Aguayo "didn't need to worry about that until he got to prison" and "could contact an immigration lawyer." R. vol. 1, 9. Aguayo argues these statements falsely implied that either (1) the disposition of Aguayo's criminal proceedings would have no impact on his immigration status, or (2) any impact would be impossible to anticipate. We agree.

As should already be clear, Aguayo's plea had serious and predictable consequences for his immigration status. By telling him "he didn't need to worry about [immigration consequences] until he got to prison," *id.*, counsel actively "misle[d]" Aguayo about the decision he faced, *Padilla*, 559 U.S. at 375 (Alito, J., concurring in the judgment). The attorney in *Padilla* did the same thing when, instead of conveying the jeopardy associated with pleading guilty, she told her client he "did not have to worry about immigration status since he had been in the country so long." *Id.* at 359 (quoting *Commonwealth v. Padilla*, 253 S.W.3d 482, 483 (Ken. 2008)). That advice, like the advice Aguayo received, was "incorrect." *Id.* at 369.

By convincing Aguayo to delay further consideration of immigration consequences until after sentencing, counsel robbed him of "'effective representation . . . at the only stage when legal aid and advice would help him'"—"plea negotiations." *Frye*, 566 U.S. at 144 (quoting *Massiah v. United States*, 377 U.S. 201, 204 (1964)). As *Padilla* explained, early and accurate assessment of the immigration consequences of a charge is crucial for developing a plea-negotiation or litigation

18

strategy to mitigate its adverse impacts. *See* 559 U.S. at 373 (endorsing creative plea-bargaining to reduce immigration consequences). Counsel's affirmative misadvice denied Aguayo that opportunity.[8]

## II.    Prejudice

Finally, a note on prong two—prejudice. *See Rushin*, 642 F.3d at 1302. In the context of plea advice, this prong requires Aguayo to show "a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty.'" *Lee v. United States*, 582 U.S. 357, 364–65 (2017) (quoting *Hill*, 474 U.S. at 59). The district court did not reach this issue. And we decline the government's invitation to do so for the first time on appeal. *See Childers v. Crow*, 1 F.4th 792, 801 (10th Cir. 2021) ("[We are] 'a court of review, not of first view.'" (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 719 n.4 (2005))).

As it stands, the record is underdeveloped on the issue of prejudice. All we have is Aguayo's motion, which simply stated that "[i]f [Aguayo] had known that a conviction under this statute would trigger automatic deportation, he would not have

---

[8] Although not bound by the district court's assessment of the facts, we note that it dismissed Aguayo's allegations as "self-serving" and "contradicted by the clear record." R. vol. 1, 111. On the latter point, the district court cited Aguayo's review of the plea agreement's immigration provision and his statements expressing satisfaction with his attorney during the plea colloquy as undermining his claim that counsel provided inaccurate advice. But as the Ninth Circuit has explained, "[t]he government's performance in including provisions in the plea agreement, and the court's performance at the plea colloquy, are simply irrelevant to the question whether *counsel's* performance fell below an objective standard of reasonableness." *Rodriguez-Vega*, 797 F.3d at 787. And it would be unreasonable to hold Aguayo to the assessment he gave of counsel's performance at the plea colloquy, when he was unaware of the true immigration consequences of his conviction.

pleaded guilty." R. vol. 1, 9. Yet as the district court explained, prejudice "is an intensely factual issue, pretty much dependent [in] this instance on the testimony of the petitioner." R. vol. 3, 19.

Remand is thus appropriate for the district court to conduct an examination into prejudice based on "the 'totality of the evidence'" concerning Aguayo's defense priorities. *Lee*, 582 U.S. at 367 (quoting *Williams v. Taylor*, 529 U.S. 362, 391 (2000)); *see also Hernandez*, 778 F.3d at 1234 ("Because [the defendant] alleged facts that, if true, would prove that his counsel performed deficiently and that he was prejudiced by her deficient performance, [he] is entitled to an evidentiary hearing."). Among other things, this inquiry may encompass Aguayo's interactions with counsel and the court,[9] his "connections to the United States," and the potential for mitigating the risk of deportation via an alternative plea bargain or by "throwing a 'Hail Mary' at trial." *Lee*, 582 U.S. at 367–70; *see also People v. Vivar*, 485 P.3d 425, 438 (Cal. 2021) ("Factors particularly relevant to [the *Lee*] inquiry include the defendant's ties to the United States, the importance the defendant placed on

---

[9] We note that in some instances—say, when counsel has advised a client that a plea carries no immigration consequences whatsoever—"a judge's warnings at a plea colloquy may undermine a claim that the defendant was prejudiced by his attorney's misadvice." *Lee*, 582 U.S. at 369 n.4. But judicial advisements don't "cure[] any prejudice" where counsel's advice "undermin[es] the judge's warnings." *Id.* Nor do they cure counsel's failure to provide sufficiently clear or specific advice, as judicial advisements are inherently "generic." Fed. R. Crim. P. 11(b)(1)(O) advisory committee's note to 2013 amendment; *see also Patterson*, 391 P.3d at 1177 ("In evaluating the court's advice, the defendant can be expected to rely on counsel's independent evaluation of the charges, applicable law, and evidence, and of the risks and probable outcome of trial." (cleaned up) (quoting *In re Resendiz*, 19 P.3d 1171, 1178 (Cal. 2001))).

avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible."). If Aguayo shows a "reasonable probability" that with effective counsel, he wouldn't have pleaded guilty—even if "[n]ot everyone in [Aguayo's] position would make the choice to reject the plea"—the district court must find prejudice. *Lee*, 582 U.S. at 371.

## Conclusion

The Sixth Amendment required counsel to advise Aguayo that his plea made him subject to automatic, presumptively mandatory, or practically inevitable deportation. The equivocal and misleading advice counsel provided Aguayo—that he "may" be deported but he "shouldn't worry about it until after his plea"—fell below the objective standard of reasonableness outlined in *Padilla*. We therefore reverse the district court's determination that Aguayo failed to show deficient performance and remand for further proceedings.